**RePIPE, INC., Appellant,**

**v.**

**James E. TURPIN, Appellee.**

No. 14–06–00704–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

July 29, 2008.

Supplemental Opinion Oct. 9, 2008.

Mario Ernesto De La Garza, Kent Rutter, Houston, for Appellant.

Charles B. Kirklin, Stephen R. Kirklin, Houston, for Appellee.

Panel consists of Justices YATES, GUZMAN, and BOYCE.

## OPINION

EVA M. GUZMAN, Justice.

In this employment contract dispute, the employer challenges the legal and factual sufficiency of the evidence supporting the judgment. Because the evidence is legally sufficient to support the judgment and factually sufficient to support some, but not all, of the damages awarded, we suggest remittitur. If remittitur of the unsupported damages is timely filed, we will reverse and remand for retrial of attorneys' fees consistent with the reduced damage

award; if it is not, we will reverse and remand for new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant rePipe, Inc., a sewer-line repair company, hired appellee James Turpin pursuant to a written Employment Agreement ("the Agreement"). In the Agreement, the parties described Turpin's duties as those "commensurate and consistent with" his employment as senior vice president for human resources. The parties further agreed that Turpin would have additional duties and responsibilities as assigned by rePipe's chief executive officer, provided that any such newly-assigned duties were not inconsistent with Turpin's then-current duties if he objected in writing within ten days.

The Agreement also described the different timing and consequences of resignation with or without "Good Reason." If Turpin resigned "with Good Reason," then he would be considered a part-time employee for one year and would be paid an amount equal to the average of his compensation for the preceding two years.[1] If he resigned "without Good Reason," then the resignation would become effective in thirty days and he would not receive compensation as a part-time employee.

On April 22, 2004, rePipe announced its restructuring. Chief Executive Officer Tim Tarrillion issued a memorandum explaining that the employment of rePipe's vice president of sales and marketing and its financial analyst was terminated and some of their former duties were reassigned to Turpin. On appeal, rePipe does not dispute that the newly-assigned tasks were inconsistent in some material respect with the position and responsibilities that Turpin held before the assignment.

Turpin performed the new duties without objection until June 2004. Around that time, rePipe terminated Tarrillion's employment for cause. According to rePipe, Tarrillion had misrepresented the company's profitability.

On June 7, 2004, Turpin gave rePipe written notice that, pursuant to the terms of the Agreement and effective immediately, he terminated his full-time employment for Good Reason and accepted part-time employment with rePipe. In the notice, he listed several reasons for his resignation, including rePipe's failure to pay Turpin's 2003 bonus and its assignment of duties to him, without his written consent, that were "inconsistent in material respects" with his then-current position and responsibilities. The next day, rePipe's acting vice president wrote Turpin that rePipe did not consider Turpin's stated reasons for resigning to constitute Good Reason under the Agreement; thus, it would treat Turpin's letter as a notice of termination without Good Reason.

Turpin sued rePipe for breach of contract and declaratory judgment, and the jury returned a verdict in his favor. As relevant to this appeal, the jury made the following findings:

- Turpin terminated his employment for Good Reason as defined by the Agreement;
- rePipe's failure to acknowledge such termination caused Turpin past damages in the amount of $277,747.56;
- rePipe failed to pay Turpin the discretionary, "non-financial" portion of his 2003 bonus;
- rePipe's failure to pay Turpin the non-financial bonus caused Turpin $16,976.92 in damages;

---

1. Such "part-time employment" would not require Turpin to work for rePipe or refrain for working for a different employer. In effect, this was a severance package.

- rePipe's failure to comply with a material obligation of the Agreement was not excused; and
- the reasonable fees for the necessary services of Turpin's attorneys totaled $131,000.00 for preparation and trial, $50,000.00 in the event of an appeal, and $25,000.00 in the event of an appeal to the Texas Supreme Court.

The trial court rendered judgment on the jury's verdict,[2] and this appeal ensued.

## II. ISSUES PRESENTED

In three issues, rePipe challenges the legal and factual sufficiency of the evidence supporting (a) the jury's finding that Turpin resigned for a Good Reason, (b) its award of $277,747.56 as compensation damages, and (c) its determination that rePipe failed to pay Turpin his 2003 non-financial bonus in the amount of $16,976.92. In its fourth issue, rePipe challenges the award of attorneys' fees.

## III. STANDARD OF REVIEW

To determine whether the evidence is legally sufficient to support the judgment, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). We assume that jurors decided questions of credibility or conflicting evidence in favor of the verdict if they reasonably could do so. *Id.* at 819, 820. If the evidence would enable reasonable and fair-minded people to differ in their conclusions, then it is legally sufficient to support the verdict. *Id.* at 822. We do not substitute our judgment for that of the trier-of-

fact if the evidence falls within this zone of reasonable disagreement. *Id.* When reviewing a jury finding for factual sufficiency, we consider and weigh all of the evidence in a neutral light and conclude that the finding is not supported by sufficient evidence only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

## IV. ANALYSIS

### A. Termination for Good Reason

In its first issue, rePipe asserts that the evidence is legally and factually insufficient to support the jury's finding that Turpin resigned for Good Reason as that phrase is defined in the Agreement. According to rePipe, the relevant provisions of the Agreement imposed the following requirements:

[I]f Turpin objected to the assignment of new responsibilities in writing within ten days, but rePipe nevertheless insisted that Turpin perform the unwanted new responsibilities, then Turpin would have 180 days during which he could resign for a "Good Reason"—unless, during those 180 days, he withdrew his timely objection and forfeited his "Good Reason" by giving written consent to the new responsibilities.[3]

RePipe contends the evidence is legally and factually insufficient because Turpin admits he did not object in writing within ten days of the April 22, 2004 assignment of inconsistent duties. Turpin, however, argues that the Agreement did not condition his right to resign for Good Reason upon such an objection.[4] To evaluate re-

---

2. The court conditioned the award of appellate attorneys' fees on affirmance of the judgment.

3. Appellant's Br., at 6.

4. Turpin also advances two "waiver" arguments. First, he contends that, by failing to object to the question in which the jury was asked if Turpin had Good Reason to resign,

Pipe's argument, we first must determine whether the Agreement required Turpin to object before resigning as rePipe contends.

### 1. Contract Construction

Our primary concern in interpreting a contract is to ascertain the true intent of the parties as expressed in the contract. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex.2006). Ordinarily, the writing alone is sufficient to express the parties' intentions, "for it is objective, not subjective, intent that controls." *Matagorda County Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex.2006) (per curiam) (quoting *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968)). We examine the writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). We presume that the parties to a contract intend every clause to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). Thus, no single provision will be given controlling effect, and all provisions will be considered with reference to the entire contract. *J.M. Davidson*, 128 S.W.3d at 229. We give terms their plain, ordinary, and generally accepted meaning unless the contract shows the parties used them in a technical or different sense. *Heritage Res.*, 939 S.W.2d at 121.

If the parties have entered into an unambiguous writing, we will enforce the parties' intentions as expressed in the contract. *Matagorda County Hosp. Dist.*, 189 S.W.3d at 740. To determine if a contract is ambiguous, we first examine the words the parties chose to use, and considering the business activity to be served, determine whether both proffered interpretations are reasonable. *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 628 (Tex.App.–Houston [14th Dist.] 2006, pet. denied). If both interpretations are reasonable, then the contract is ambiguous and there is a genuine issue of material fact regarding the parties' intent. *J.M. Davidson*, 128 S.W.3d at 229. But if only one interpretation is reasonable, we will enforce the contract according to its terms. *XCO*, 194 S.W.3d at 628.

### 2. Terms of the Agreement

The sections of the Agreement that are central to rePipe's first issue provide as follows:

Section [5(b)] *Termination by the Employee.* (i) The Employee will be entitled to terminate his Employment (A) for a Good Reason at any time within 180 days after the facts or circumstances constituting that Good Reason first exist and are known to the Employee . . . .

"Good Reason" for the Employee's termination of his Employment means: . . . (iii) the assignment to the Employee without the Employee's written consent of duties inconsistent in any material respect with the Employee's then cur-

rePipe waived its challenge to the jury's finding. We disagree. RePipe does not contend that this question should not have been submitted or should have been submitted differently; rather, rePipe argues that its interpretation of the contract was correct, and thus, the jury was required to answer the question in the negative. Turpin also argues that re-Pipe waived its challenge to this finding by failing to address all possible grounds supporting the jury's answer. According to Turpin, the jury could have found that he had Good Reason to resign because rePipe failed to pay Turpin's 2003 bonus. Because rePipe does challenge the jury's finding that Turpin was not paid the 2003 bonus, this argument is without merit.

rent positions, authority, duties or responsibilities . . . .

These unambiguous terms allow an employee to terminate his employment for Good Reason within 180 days after learning that rePipe has assigned inconsistent duties to him without his written consent. Relying on these provisions, Turpin argues that his resignation fulfilled these requirements because (a) on April 22, 2004, he was assigned duties "inconsistent in any material respect" with his "then current positions, authority, duties or responsibilities"; (b) he did not consent in writing to the assignment; and (c) he sent rePipe his notice of termination for Good Reason less than 180 days later.[5]

On appeal, rePipe does not dispute that the April 2004 changes to Turpin's duties were inconsistent in some material respect with the responsibilities that had previously been assigned to him. Instead, rePipe argues that the newly-assigned tasks must be considered part of Turpin's "then current" responsibilities because Turpin failed to object in writing to the assignment within ten days. In support of this interpretation, rePipe relies on the following provision of the Agreement:

> Section 2. *Employment.* (a)(i) the Company will employ the Employee as its Senior Vice President, Human Resources . . . , (iii) The Employee also will have such additional powers, authority, functions, duties and responsibilities as the chief executive officer of the Company . . . may assign to the Employee from time to time; provided that any such assignment . . . shall not be inconsistent or interfere with, or detract from, those herein vested in, or otherwise then being performed for the Company by[ ] the Employee if the Employ-

ee objects in writing within ten days of the date on which the chief executive officer or his delegate advises the Employee of that assignment.

According to rePipe, this part of the Agreement required Turpin to provide rePipe with notice of his objections so that rePipe would have an opportunity to overcome them. As rePipe's trial counsel explained in closing argument, "Before [Turpin] sent in his resignation letter, he never gave rePipe a decent chance to address the things he was complaining about and try to fix them, because he never gave rePipe fair notice about his complaints."

### 3. Harmonizing the Provisions

RePipe's interpretation is inconsistent with the unambiguous language of the Agreement in several respects. First, the Agreement does not require Turpin to give rePipe an opportunity to remedy the conditions that constitute Good Reason for his resignation. To the contrary, Section 5(b)(i)(A) of the Agreement provides that Turpin is entitled to resign for Good Reason "at *any* time within 180 days" after learning of the assignment of inconsistent duties (emphasis added).

Second, under rePipe's interpretation of the Agreement, rePipe could alter Turpin's duties without his consent and without risk that he would terminate his employment for Good Reason. Instead, it could add or remove responsibilities and wait to see if he objected within the ten-day window. This is inconsistent with Section 1 of the Agreement, under which Good Reason is defined to include "the assignment to the Employee *without the Employee's written consent* of duties inconsistent in any material respect" with his then-current duties. (emphasis added). The parties did not

---

**5.** Although Turpin also contends that his duties materially changed again during the first week of June 2004, discussion of this

allegation is not necessary to our disposition of the case.

include material changes in Turpin's duties "to which he did not object" or "which rePipe requires Turpin to perform despite his written objections" among the circumstances constituting Good Reason for termination.

RePipe's interpretation also ignores the conditional phrase, *"provided that."* [6] The parties agreed that rePipe could assign additional duties *provided that,* if Turpin objected, then the duties assigned *"shall not be* inconsistent or interfere with, or detract from" Turpin's existing duties (emphasis added). Thus, rePipe's interpretation that Good Reason exists only if rePipe requires Turpin to perform duties over his objection cannot be correct, because the Agreement prohibits rePipe from materially changing Turpin's duties over his objection. *See Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex. 1976) (explaining that the term *"provided that"* is a limiting clause that conditions performance on some act or event); *accord, Marsh v. Marsh,* 949 S.W.2d 734, 744 (Tex.App.–Houston [14th Dist.] 1997, no writ) (same). The "objection" provision is directed at Turpin's responsibilities during his employment, and gave Turpin the power to "veto" the assignment of inconsistent duties to him. It does not, however, impose an additional condition on his ability to resign for Good Reason.

In sum, we conclude that the Agreement is subject to only one reasonable interpretation. *See Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.,* 121 S.W.3d 742, 746 (Tex.2003); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996); *XCO,* 194 S.W.3d at 632. Because the unambiguous terms of the Agreement did not require Turpin to object to the assign-

ment before he could have Good Reason to resign, his failure to object does not render the evidence of Good Reason for his resignation legally or factually insufficient. We therefore overrule rePipe's first issue.

**B. Compensation Damages**

 In its second issue, rePipe argues that the evidence is legally and factually insufficient to support the jury's finding that Turpin was entitled to $277,747.56 for unpaid compensation. This argument requires us to determine the legal effect of the following uncontroverted facts and contract terms:

- Under the terms of the Agreement, an employee who terminates his employment for Good Reason becomes a part-time employee.
- A part-time employee is paid an amount equal to the average of the employee's compensation in the preceding two years.
- On June 7, 2004, Turpin notified rePipe in writing that, effective immediately, he terminated his full-time employment for Good Reason and accepted part-time employment with rePipe.
- The average of Turpin's 2002 and 2003 compensation is $228,386.70.
- On March 20, 2006, a few weeks before trial, rePipe received a letter from Turpin in which he stated that he continued to be an "Active Status Employee" because rePipe "wrongfully blocked" his prior notice of termination. Turpin stated that he was terminating his employment for Good Reason and accepting part-time employment on March 20, 2006.
- The average of the compensation Turpin would have received as an active,

<hr>

6. Although this point is not addressed by either party, the interpretation of the unambiguous language of a contract presents a question of law we review de novo by examining and considering *all* provisions of the entire contract. *Coker,* 650 S.W.2d at 393.

full-time employee in 2004 and 2005 is $277,747.56.

RePipe argues that if Turpin terminated his employment for Good Reason, then he did so on June 7, 2004. Because the compensation due for Turpin's part-time employment is based on the average of his 2002–03 compensation, and Turpin testified without contradiction that this average is $228,386.70, rePipe argues there is legally and factually insufficient evidence to support the award of $277,747.56.

It is Turpin's position that rePipe "blocked" the commencement of his part-time employment in June 2004; therefore, he continued to be actively employed on a full-time basis at the time of trial. He contends there is sufficient evidence to support the jury's award because, based on an effective part-time employment date at the close of trial in 2006, he is entitled to recover the average of the compensation he would have earned in 2004 and 2005. According to Turpin, the jury's finding is supported by his testimony that this average is $277,747.56.

In support of his argument, Turpin relies on the following provision of the Agreement:

Section 3. *Term of Employment.* Subject to the provisions of Section 5, the term of the Employee's Employment will be for an initial term of two years, provided that, beginning on the first anniversary of the Effective Date, the term of the Employee's Employment will be for a term of one year commencing on that anniversary date and renewing each day thereafter for an additional day without any further action by either the Company or the Employee until an event has occurred as described in, or

one of the parties has made an appropriate election pursuant to, Section 5. After the Termination Date has occurred and the Company has paid to the Employee all the applicable amounts Section 5 provides the Company will pay as a result of the termination of the Employee's Employment, including all amounts accruing during the Part-time Employment Period, if any, this Agreement will terminate and have no further force or effect . . . .

Section 5 addresses the compensation owed to an employee after termination. Reading these sections together, Turpin asserts that his full-time employment continued to renew every day until the post-termination compensation due to him under Section 5 of the Agreement was paid in full.

This interpretation, however, is contradicted by the plain language of the Agreement. Section 3 provides that Turpin's employment did not renew after "one of the parties has made an appropriate election" under Section 5 of the Agreement. Here, Turpin elected to terminate his full-time employment for Good Reason pursuant to Section 5(b)(i)(A) on June 7, 2004; thus, the Employment Agreement was not renewed again, and he spent the final year of his employment as a part-time employee.[7]

Despite Turpin's assertions to the contrary, rePipe did not—indeed, *could* not—"block" Turpin's part–time employment. The Agreement provides that if the employee terminates his employment for Good Reason, then he becomes a part-time employee on "the date the Nonterminating Party receives the Terminating Party's

---

7. Moreover, the internal inconsistency of Turpin's argument is apparent on its face: if the consequence of rePipe's failure to pay Turpin's post-termination compensation is that Turpin's full-time employment is renewed for another year, then Turpin's employment is no longer terminated, and rePipe does not owe him post-termination compensation.

Notice of Termination." Thus, regardless of whether rePipe agreed that he had Good Reason to resign or even acknowledged receipt of the notice, Turpin's part-time employment began when rePipe received his notice of termination for Good Reason on June 7, 2004.

Under the unambiguous terms of the Agreement, Turpin's compensation as a part-time employee is equal to the average of his compensation in the preceding two years, and the evidence is uncontroverted that the average of his 2002 and 2003 compensation is $228,386.70. Because Turpin's testimony supports part of the damage award, it is some evidence of damages, and the evidence is legally sufficient to support the jury's finding; however, the evidence is factually insufficient to support an award in excess of $228,386.70. We therefore sustain rePipe's second issue in part, and suggest that Turpin remit $49,360.86 of the compensation found by the jury. *See* TEX.R.APP. P. 46.3; *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex.1987) ("If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict. The party prevailing in the trial court should be given the option of accepting the remittitur or having the case remanded.").

## C. Non–Financial Bonus Award

RePipe argues in its third issue that the evidence is legally and factually insufficient to support the jury's finding that rePipe did not pay Turpin one of the bonuses he earned in 2003. According to rePipe, the bonus was contingent upon rePipe meeting its financial targets as well as its non-financial goals, and because rePipe did not meet its financial objectives in 2003, no bonus was due.[8] Alternatively, rePipe contends the evidence conclusively

established that the bonus at issue has been paid in full. To evaluate these arguments, we return to the language of the Employment Agreement.

### 1. Entitlement to the Non–Financial Bonus

■ Section 4(b) of the Agreement provides:

Performance-based awards under the Bonus Plan (i) will include awards to Bonus Plan participants who have operating control and responsibility for areas of the Company's operations if those areas achieve their applicable earnings before interest and taxes as budgeted by the Board and (ii) may include awards to Bonus Plan participants based on other criteria the Compensation Committee may establish in its sole discretion.... Schedule 4(b) to this Agreement sets forth the format for the Company's Executive Bonus Plan and the specific criteria for the Employee's bonus under the Bonus Plan for the year ended December 31, 2000.

Section 4(b)(i) addresses bonuses for employees with control of operations, and makes such bonuses contingent on achievement of earnings goals. At trial, these types of bonuses were referred to as "financial bonuses." Section 4(b)(ii), however, allows rePipe's Compensation Committee ("the Committee") to base bonus awards on "other criteria." The parties refer to these awards as "discretionary" or "non-financial" bonuses. The two types of bonuses are assessed, funded, and timed differently, according to Schedule 4(b) ("the Schedule") attached to the Agreement.

### a. The "EBITDA Bonus Pool"

Under the Schedule, the total "executive bonus pool" from which bonuses are paid

---

8. According to rePipe, the company lost $31 million in 2003.

consists of two portions. Seventy-five percent of the bonus pool is determined by the financial performance of rePipe's parent company, rePipe Holdings, Inc. ("Holdings") and its subsidiaries. This portion of the bonus pool, referred to in the Schedule as "the EBITDA bonus pool," consists of a percentage of the collective "excess EBITDA" of Holdings and its subsidiaries. "Excess EBITDA" is defined as "[a]ctual pre-bonus earnings before interest, taxes, depreciation and amortization ('EBITDA') minus: cash fixed charges on debt and preferred stock; capital expenditures; the change in working capital from the beginning of the year; and estimated bonus payments." The percentage of "excess EBITDA" comprising the EBITDA bonus pool must be approved by the Committee each year in conjunction with the approval of the annual budget.

Half of each executive's expected financial bonus is paid in quarterly installments, and the other half is due after completion of rePipe's annual audit. Both of these distributions are made "from the EBITDA bonus pool."

### b. The "Discretionary Pool"

The remaining twenty-five percent of the executive bonus pool is "established at the full discretion of the Committee to reward the successful achievement of non-financial goals established annually for each executive." The Schedule further provides that "[d]istribution of [a] discretionary bonus will be based on the individual's achievement of his/her individual goals, as assessed by his/her supervisor, and the total discretionary pool established by the Committee." Additionally, the Schedule provides that, unlike the financial bonus, "[t]he entire discretionary component of each employee's bonus for each year will be funded and paid after completion of the annual audit for that year."

### c. Bonus Eligibility

According to rePipe, a non-financial bonus was not due because rePipe did not meet its financial targets in 2003. This argument is based on the statement in the Schedule, "The executive bonus plan for rePipe, Inc., provides for annual bonuses based on percentages of rePipe's executive employees' base salaries if the financial targets and non-financial goals of [Holdings] are achieved."

In interpreting the Agreement, however, "[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994) (quoting *Guardian Trust Co. v. Bauereisen*, 132 Tex. 396, 404–05, 121 S.W.2d 579, 583 (1938)). Reading the contract as a whole, we cannot say that this language means that no non-financial bonuses are due if rePipe (or its parent company) fails to meet its financial goals.

First, the Agreement provides that the Committee may award bonuses based on other criteria it establishes in its sole discretion. In addition, financial bonuses are paid from one pool of funds linked to financial performance, but non-financial bonuses are paid from a separate pool for the express purpose of rewarding the achievement of non-financial goals. Moreover, the Schedule expressly provides that distribution of non-financial bonuses is based on (a) the executive's achievement of his or her individualized annual goals, as assessed by the executive's supervisor, and (b) the total discretionary pool established by the Committee. These specific provisions express the parties' intent to define, assess, and reward non-financial achievement separately from financial performance. *See id.* at 133–34 (applying the prin-

ciple that more specific terms of a contract control more general terms).

Here, Turpin's individual non-financial bonus plan was approved by the Committee and tied to criteria unrelated to re-Pipe's financial performance. The evidence shows that his supervisor assessed Turpin's performance and determined that he had earned a non-financial bonus. Turpin further testified that his 2003 non-financial bonus was earned, accrued, and awarded, but not paid. We therefore conclude that the evidence is both legally and factually sufficient to support the conclusion that Turpin is entitled to receive a bonus based on his achievement of non-financial goals in 2003.

### 2. Payment of the Non–Financial Bonus

■ In its alternative argument, re-Pipe contends that it overpaid Turpin's 2003 financial bonus by an amount exceeding any non-financial bonus owed. This overpayment allegedly occurred because, as previously discussed, half of an executive's expected financial bonus is paid in quarterly installments in the same year the bonus is earned. Cassie Reeves, re-Pipe's human resources manager from 2001 to 2005, explained that these portions of the expected financial bonuses were paid at "[t]he close of books following the quarter." Based on payroll records, Reeves further testified that Turpin received a financial bonus of $21,646.00 in 2003.

But, the evidence is conflicting. Randy Jennings, rePipe's chief accounting officer, testified that bonus payments listed on the payroll records of a given year do not represent the bonuses awarded for that year. Jennings explained that bonuses are not paid in full by the end of a calendar year, so there are "lag payments associated with the bonus year." Turpin similarly testified that non-financial bonuses were paid during the subsequent calendar year; thus, a bonus paid in 2003 may have been earned in 2002. When Jennings was asked if Turpin was "overpaid on his bonus," Jennings responded, "I don't believe so. I'm not sure. I just remember that issue coming up."

Based on the conflicting evidence, we cannot say that the evidence is legally or factually insufficient to support the jury's finding that rePipe failed to pay Turpin the 2003 non-financial bonus.

### 3. Amount of the Non–Financial Bonus

■ RePipe also argues that the evidence is legally and factually insufficient to support the amount of the damages awarded for its failure to pay Turpin the 2003 non-financial bonus. A corporate bonus form generated by rePipe shows that Turpin earned 85% of the "target" non-financial bonus amount of $19,153, or $16,280.05. Because this is some evidence to support the jury's award of $16,976.92, the evidence supporting the award is legally sufficient; however, there is no evidence in the record that the amount of Turpin's 2003 non-financial bonus exceeded $16,280.05.[9]

On this record, we conclude the evidence is factually sufficient to support only part of the jury's finding. The evidence that Turpin was owed a non-financial bonus in

---

9. RePipe asserts there is no logical connection between the amount found by the jury and the evidence concerning the amount of Turpin's non-financial bonus. The company correctly points out that the figure awarded by the jury appears in the record only in a check and its accompanying letter, in which rePipe's chief accounting officer explained that the check for $16,976.92 represents payment for Turpin's previously accrued but unused vacation days and prorated car allowance.

the amount of $16,280.05 is legally and factually sufficient to support this portion of the award, but it is factually insufficient to support the larger amount found by the jury. We therefore sustain rePipe's third issue in part and suggest that Turpin remit $696.87 of the bonus award.

### D. Attorneys' Fees

In its final issue, rePipe argues that Turpin is not entitled to recover attorneys' fees because he is not entitled to prevail on his contract claims. In the event of a partial reversal, however, rePipe asks us to vacate the award of appellate attorneys' fees and remand for a reassessment of those fees. *See Bossier Chrysler–Dodge II, Inc. v. Rauschenberg,* 238 S.W.3d 376, 376 (Tex.2007) (per curiam) (if damages are reduced, attorneys' fees should ordinarily be retried unless appellate court is "reasonably certain that the jury was not significantly influenced by the erroneous [damage award]" (quoting *Barker v. Eckman,* 213 S.W.3d 306, 314 (Tex.2006))).

■ We sustain this issue. Because we cannot be reasonably certain that the jury was not significantly influenced by the erroneous damage amounts it considered, we reverse the award of trial and appellate attorneys' fees and remand the case for a new trial of these issues. *See Young v. Qualls,* 223 S.W.3d 312, 313 (Tex.2007) (per curiam) (remanding case for retrial of the attorneys' fees issues after party timely filed the suggested remittitur).

### V. Conclusion

We hold that the evidence is legally and factually sufficient to support the portion of the judgment addressing liability. Although the evidence is legally sufficient to support an award of damages and factually sufficient to support part of the amount awarded, it is factually insufficient to support the total damages awarded. Pursuant to Texas Rule of Appellate Procedure 46.3, we suggest a remittitur of $50,057.73, representing reductions of $49,360.86 from the compensation award and $696.87 from the non-financial bonus award. If Turpin files a remittitur within twenty-one days from the date of this opinion, we will modify the trial court's judgment to reflect the award of $244,666.75 in compensatory damages, affirm that portion of the judgment as modified, reverse the portion of the judgment awarding attorneys' fees, and remand the case for retrial of that issue. In the event a remittitur is not timely filed, we will reverse the judgment and remand the case for a new trial.

### SUPPLEMENTAL OPINION

EVA M. GUZMAN, J.

On July 29, 2008, we issued our original opinion in this case, suggesting a remittitur of $50,057.73 from the Final Judgment issued by the trial court. We further provided that if such remittitur was filed within twenty-one days from the date of our opinion, we would modify the trial court's judgment to reflect the award of $244,666.75 in compensatory damages, affirm that portion of the judgment as modified, reverse the portion of the judgment awarding attorneys' fees, and remand the case for retrial solely on the issue of attorneys' fees.

On July 29, 2008, appellee filed a remittitur with the clerk of this court, stating that he "desires to and does remit $50,057.73 of that Judgment in order to obviate any need for new trial except as to attorneys' fees, as suggested by the Appellate Court in its Opinion." We therefore issue this supplemental opinion, and in accordance with our original opinion and appellee's timely-filed remittitur, we modify the trial court's judgment to reflect the award of $244,666.75 in compensatory damages (consisting of $228,386.70 in com-

pensation as a part-time employee from June 2004 to June 2005, and $16,280.05 as the accrued but unpaid 2003 non-financial bonus), affirm the award of actual damages as modified, reverse the portion of the judgment awarding attorneys' fees, and remand the case for retrial of that issue. Our original opinion remains otherwise in effect.