NUMBER 13-05-00281-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


DANA CORPORATION, Appellant,


v.
 


MICROTHERM, INC. AND 

DAVID E. SEITZ, INDIVIDUALLY, Appellees.

 


On appeal from the 357th District Court 


of Cameron County, Texas.


 


MEMORANDUM OPINION



Before Justices Yañez, Rodriguez, and Benavides


Memorandum Opinion by Justice Rodriguez



 Appellee/cross-appellant, Microtherm, Inc., manufactured and sold the Seisco®
electric tankless water heater. Microtherm bought thermistors, component parts used in
its water heaters, from appellant/cross-appellee, Dana Corporation (Dana). (1) Complaining
that the thermistors failed, Microtherm filed suit against Dana. (2) Appellee/cross-appellant,
David E. Seitz, the owner and chief executive officer of Microtherm, also filed suit against
Dana in his individual capacity as inventor and owner of patents relating to the Seisco
technology. (3)

 After a trial on the merits, a jury found, among other things, that Dana knowingly
violated the Texas Deceptive Trade Practices Act (DTPA). The trial court entered
judgment on the verdict in favor of Microtherm and against Dana. The judgment awarded
actual and additional damages, pre-judgment and post-judgment interest, and attorneys'
fees. Dana appeals the trial court's judgment.

 By five issues with multiple sub-issues, Dana challenges each of the jury's liability
and damage findings, the trial court's award of attorneys' fees, and the trial court's refusal
to include certain jury charge damage instructions. On cross-appeal, Seitz contends that
we should reinstate his individual claims because the trial court erred in rendering a take-nothing judgment against him. We affirm in part, affirm, as modified, in part, and reverse
and remand in part.

I. Factual Background The Seisco water heater is tankless. It uses electronically-controlled elements to
heat water as the water flows through the chamber. The Seisco's primary component parts
include the following:

(1) the chambers: each heater has two or four small, resin water chambers,
manufactured with DuPont's Zytel resin;


(2) the heating element: each chamber has a heating element that is screwed into the
chamber part;


(3) thermistors: each chamber also has thermistors which provide a temperature
measurement; and


(4) the circuit or control board: each water heater has a circuit board to interpret sensor
readings and regulate temperature.


 In 1999 and 2000, various component parts of the Seisco water heater--including
plastic chambers manufactured by Puget Plastics Corporation (Puget) and then by United
Plastics Group (UPG), heating elements manufactured by Emerson Electric Co.
(Emerson), and thermistors made by Dana--began to fail. Various component parts
continued to fail through 2002.

 Relevant to Microtherm's claims against Dana, in 1989, Microtherm's predecessor
began purchasing thermistors from General Automotive Specialties, a company that was
sold to another company which later became Dana. Some thermistor failures occurred
from 1989 to 1999. In 2000, Dana replaced approximately 400 thermistors. In August
2000, Microtherm contacted Dana to discuss the problem it was having with the
thermistors. In response, Dana initiated an investigation.

 On January 15, 2001, Dana issued an 8-D corrective action report, which described
the problem as follows: "Resistors are drifting in resistance. The customer must turn the
screw terminals for the thermistors to stay in line." The report also identified the "root
cause" to be that the "[t]hermistors are out of spec" (contributing 85% to the malfunction)
and "[h]ousing and thermistor [are] contaminated" (contributing 15% to the malfunction). 
Dana sent the report to Microtherm. To contain the problem, Dana's report recommended
that, effective January 4, 2001, Microtherm "send back all bad thermisters [sic] to the
supplier. Request a new shipment of thermisters [sic] within spec as soon as possible to
met [sic] production schedule. Issue a Quality Alert Notice to the test station and process
inspection to check for drifting thermistors." As a permanent corrective action, the report
recommended the following: (1) inspecting all thermistors before assembly and checking
their resistance at room temperature, at 100 degrees and at 220 degrees Fahrenheit; (2)
cleaning the thermistors with very fine sandpaper and washing with alcohol; (3) cleaning
inside the housing to eliminate probable contamination; and (4) updating the process
sheets to reflect the corrective action implemented January 15, 2001. This permanent
corrective action was to be effective with the next production schedule. Luis Sada, a
quality control engineer identified in the January 15 8-D corrective action report, was one
of the persons responsible for verifying that the permanent corrective action was
implemented.

 Between January and April 2001, the thermistors continued to fail. (4) Sada issued
a quality control report dated April 11, 2001, again addressing Microtherm's November 7,
2000 complaint. Dana did not send the April 2001 report to Seitz. Seitz's talks with Dana
after April 2001 were not productive, leading Microtherm, in late 2001, to terminate its
relationship with Dana.

II. Procedural Background

A. Microtherm's Claims

 Microtherm sued Dana, Puget, and UPG alleging breach of express and implied
warranties through the DTPA, other DTPA laundry-list and unconscionability violations,
fraud, and negligent misrepresentation. Microtherm sought lost profits, lost business value,
and repair costs. Microtherm claimed that defective component parts resulted in water
heater failures that caused customers to stop buying the Seisco water heater, which in turn
caused Microtherm to lose profits and the company to lose value.

 Following a four-week trial, the jury found all trial defendants liable for each DTPA
breach of warranty, laundry-list violation, and unconscionable act. It found that the DTPA
violations, unconscionable actions, and breaches of warranty were committed "knowingly." 
The jury also held the trial defendants liable for fraud and negligent misrepresentation.

 As instructed by the trial court and over Microtherm's objection, the jury made
damages findings on a defendant-by-defendant divisible basis. Based on its affirmative
DTPA findings, the jury found damages against Dana as follows: (1) $200,000 for the cost
to repair and/or replace the failed thermistors; (b) $12,400,000 in lost profits; and (c)
$15,000,000 for the loss to the value of Microtherm. (5) It also found that $250,000 should
be awarded to Microtherm against Dana because the conduct was committed knowingly. (6) 
In addition, the jury awarded actual damages totaling $1,500,000 and exemplary damages
totaling $330,000 on Microtherm's fraud claim against Dana. (7) Microtherm, however,
elected to recover under the DTPA claims, not the fraud claim. No damages were awarded
for negligent misrepresentation. Finally, the trial court's judgment awarded attorneys' fees
against Dana in the amount of $12,463,485. (8) It also awarded pre-judgment and post-judgment interest.

B. Seitz's Individual Claims Seitz claimed that he was entitled to individual recovery on his claims for breach of
warranty, DTPA, and negligence against Dana. He asserted that, because of the failures
resulting from defective component parts, he had lost patent royalties and valuable patent
rights. At the close of the plaintiffs' case, the trial court directed a verdict in Dana's favor
on Seitz's individual claims.III. Challenges to Liability Findings

 In its first issue, Dana generally contends that it is not liable to Microtherm under any
theory of recovery. By numerous sub-issues, Dana attacks each of the jury's liability
findings, asserting that (1) the jury's DTPA breach of warranty findings are immaterial and
supported by insufficient evidence; (2) the DTPA laundry-list and unconscionable conduct
findings are immaterial and supported by insufficient evidence; (3) there is no evidence to
support the jury's "knowingly" findings; and (4) if reached, the jury's fraud findings will not
support a judgment. Because Dana addresses the jury's breach of warranty findings first
on appeal, we begin with those findings.

A. Threshold Issue: Limitation of Liability

 The jury found Dana breached both express and implied warranties under the
DTPA. Before reviewing the jury's findings, however, we must consider a threshold
question--whether Dana limited its liability as to all breach of warranty claims. Dana
argues that Microtherm cannot escape damage limitations because Dana provided
Microtherm with invoices for the thermistors sold to Microtherm, invoices that contained
limitation of liability provisions. (9) It is undisputed, however, that the limitation provisions
were found on the back side of Dana's invoices, and Microtherm claims that Dana failed
to prove that Microtherm received the back side of the invoices.

1. Applicable Law

 The sale of thermistors, a sale of goods, is subject to the warranty provisions of
chapter 2 of the Texas Business and Commerce Code (the UCC). See PPG Indus. v.
JMB/Houston Ctrs. Ltd. P'ship, 146 S.W.3d 79, 83 & n.4 (Tex. 2004) (citing Tex. Bus. &
Com. Code Ann. § 2.102 (Vernon 2009) (providing that the chapter applies to transactions
in goods)). "Chapter 17 of the same [c]ode (the DTPA) allows consumers to bring breach
of warranty claims under that chapter as well." Id. at 83 & n.5 (citing Tex. Bus. & Com.
Code Ann. § 17.50(a) (Vernon Supp. 2008) (providing that consumers "may maintain an
action where any of the following constitute a producing cause of economic damages or
damages for mental anguish: . . . (2) breach of an express or implied warranty")).

 The UCC also provides that damages for breach by either party may be limited by
agreement. Materials Mktg. Corp. v. Spencer, 40 S.W.3d 172, 176 (Tex. App.-Texarkana
2001, no pet.) ("[c]onsequential damages may be limited or excluded unless the limitation
or exclusion is unconscionable"); see Tex. Bus. & Comm. Code Ann. §§ 2.718, 2.719
(Vernon 2009) (allowing for liquidation or limitation of damages by agreement). Because
an action for breach of warranty is not a creation of the DTPA, limitation of damages under
the UCC applies to contract claims and to warranty claims made pursuant to the DTPA. 
See Sw. Bell Tel. Co. v. FDP Corp., 811 S.W.2d 572, 576-77 (Tex. 1991); Spencer, 40
S.W.3d at 176.

 "This [limitation] provision presumes[, however,] that both parties are aware of the
limitation of damages." Spencer, 40 S.W.3d at 176 (explaining that the limitation on which
MMC relied was on the back of its preprinted invoice sent to a third party, not to the
Spencers, and MMC had no evidence that it notified the Spencers of the limitation of
damages or that the Spencers were aware that the invoice had a back side). Moreover,
"[f]orcing a limitation on a party without . . . knowledge or even consultation would go
against the general policy behind the DTPA." Id. (citing Tex. Bus. & Com. Code Ann. §
17.44 (Vernon 2002) (providing that the DTPA shall be liberally construed and applied "to
promote its underlying purposes, which are to protect consumers against false, misleading,
and deceptive business practices, unconscionable actions, and breaches of warranty and
to provide efficient and economical procedures to secure such protection")).

2. Invoice Limitation Provisions

 On the back side of the invoices at issue in this case, set off by the heading
"DEFECTIVE MERCHANDISE," Dana provided that, at its option, it would "replace
merchandise without charge or allow credit for merchandise found, after inspection, to be
defective due to workmanship or materials." In a section titled "LIMITATIONS OF
LIABILITY," the following paragraph excluded liability for consequential and exemplary
damages, including claims for lost profits or revenues:

 (A) DANA WILL NOT UNDER ANY CIRCUMSTANCES, WHETHER AS
A RESULT OF BREACH OF CONTRACT, BREACH OF
WARRANTY, TORT OR OTHERWISE BE LIABLE FOR
CONSEQUENTIAL, INCIDENTAL, SPECIAL OR EXEMPLARY
DAMAGES including, but not limited to loss of profits or revenues,
loss of use of or damage to any associated equipment, cost of capital,
cost of substitute products, facilities or services, down-time costs, or
claims of Buyer's customers.


This section also included the following paragraph which limited liability to the price of the
product or shipment involved:

 (B) DANA'S LIABILITY ON ANY CLAIM OF ANY KIND FOR ANY LOSS
OR DAMAGE ARISING OUT OF, RESULTING FROM, OR
CONCERNING ANY ASPECT OF THIS AGREEMENT OR FROM
THE PRODUCTS OR SERVICES FURNISHED HEREUNDER
SHALL NOT EXCEED THE PRICE OF THE SPECIFIC PRODUCT
OR SHIPMENT WHICH GIVES RISE TO THE CLAIM.


3. Receipt of Back Side of Invoice

 Relevant to our analysis is the undisputed fact that the limitations to which Dana
refers were printed on the back of a two-sided invoice. To support its contention that
Microtherm received copies of both sides of the invoices, Dana relies on the testimony
provided by Carmine Auditore, plant manager of Candidos Universales in Matamoros,
Mexico, where the thermistors were assembled. Auditore agreed that invoices in a multiple
set of carbons were generated at the plant. He explained that Dana retained a green-colored invoice copy in its files at the plant and "[t]he white copy [was] the original invoice
that [went] directly to the client, in this case Microtherm. . . . The invoice [was] always sent
to the sold[-]to party. The product would be sent to the ship[-]to party." Auditore testified
that the invoice would have been sent to Microtherm, 223 West Air Tex, Houston, TX
77090.

 However, the only two-sided invoices admitted at trial were the green-colored
invoices kept by Dana. Any invoices sent to Microtherm would have been white, not green. 
Copies of the white two-sided invoices, which Dana claimed would have been sent to
Microtherm, are not in the record. At trial, Microtherm introduced faxed copies of the front
side of some invoices which were copies produced by Dana during discovery. The faxed
copies were of the front side only and did not have a back side that contained the limitation
language.

 We cannot conclude that the exhibits at trial and Auditore's testimony established
that Microtherm received the back side of the white copy of the invoice. Our conclusion
is supported by the trial testimony of Seitz, who--after being asked on cross-examination
to read part (A) of the limitations-of-liability paragraph on the back side of Dana's invoice
and agree that it was essentially the same warranty Microtherm made in regard to the
thermistors in its water heaters--responded, "I have not seen this. I don't know. I have
not seen this document." Acknowledging that he did not handle the invoices personally,
Seitz also testified that when his office received the invoices, he "suspected" that his office
knew they were from Dana because of Dana's logo that appeared on the upper left-hand
side of the front side of the invoice. There is no evidence that Microtherm received the
back side of the invoices.

4. Acceptance of Additional Terms

 Dana also contends that the sales invoices, which included Dana's terms and
conditions of sale, were its confirmations and acceptances of Microtherm's offers. See
Tex. Bus. & Com. Code Ann. § 2.207 (Vernon 2009) ("a written confirmation which is sent
within a reasonable time operates as an acceptance even though it states terms additional
to or different from those offered or agreed upon"). Dana asserts, pursuant to section
2.207, that, through the invoices, the liability limitations became a part of the parties'
contract. See id. However, we have already determined that there was no written
confirmation of the terms and conditions at issue because there is no proof that Microtherm
received the back side of the invoices. Therefore, this argument fails.

5. Course of Conduct

 In addition, Dana argues that because Microtherm accepted the goods, consistently
paid for the thermistors with checks that referenced the some twenty invoices for over three
years, and neither objected to nor questioned Dana's liability limitations, Microtherm,
through its course of conduct, accepted the limitation-of-damages terms. As support for
this argument, Dana refers this Court to Tubelite, a Division of Indal, Inc. v. Risica and
Sons, Inc. and Asgrow Seed Company v. Gulick, 420 S.W.2d 438, 441 (Tex. App.-San
Antonio writ ref'd n.r.e., 1967).

 In Tubelite, the Texas Supreme Court considered "whether post[-]contract[-]
formation conduct of the parties [was] sufficient to modify the terms of the agreement to
include payment of late charges." 819 S.W.2d at 804. After the written offer and
acceptance had occurred, Tubelite added a late charge to the statements sent to Risica. 
Id. at 802. It was undisputed that Risica received the statements of account. Id. Risica,
while not formally objecting to these charges, made five partial payments, none of which
exceeded the principal amount due. Id. at 805. The supreme court acknowledged that,
"[a]cquiescence to the contract by the party to be charged may be implied from his
affirmative actions, such as when he continues to order and accept goods with the
knowledge that a service charge is being imposed and pays the charge without timely
objection." Id. It then held that "Risica's failure to formally object to the unilateral addition
of a late charge will not support a finding of implied modification of the existing contract." 
Id.

 Unlike Tubelite, we are addressing contract formation, not modification. There is
no evidence to establish that Microtherm received the limitation-of-damages provisions on
the back side of the invoices. Thus, we would conclude that Microtherm's receipt of the
thermistors was no evidence of an agreement to limit damages or of a mutual intention to
modify the contract to include the limitation of damages provisions. See id. And without
more, Microtherm's failure to object to the provisions does not establish an agreement to
limit damages between the parties. See id.

 Likewise, we cannot conclude that Asgrow provides support for Dana's contention
that Microtherm, through its course of conduct, accepted the limitation-of-damages terms. 
See 420 S.W.2d at 441-42. The Asgrow parties engaged in a series of commercial
transactions with the Gulik parties, each time using the same forms with the same
limitations of liability arising from the sale of seeds. Id. at 441. Based in part upon
testimony that "the same limitation of warranty and liability had been on the shipping
instructions and invoices delivered to appellees on the previous purchases," the San
Antonio Court found that those contractual limitations were incorporated by implication into
the contract. Id. at 442. The Gulicks signed the shipping instructions, and the invoices
covering all the seed purchased were mailed to the Gulicks. See id. at 441. The issue of
whether the Gulick parties had knowledge of the limitation provisions, however, was never
raised in Asgrow. Unlike the present case, it is apparent that both parties in Asgrow
recognized the limitations of warranty and liability provisions contained on the shipping
instructions and invoices. See id. at 441-44.

 Dana also notes that the checks issued by Microtherm to pay for each invoice
specifically referenced Dana's invoice number. Dana argues that absent receipt of the
double-sided, white-colored invoices, Microtherm would have had no source for these
invoice numbers. However, our review of the invoices in the record reveal that the invoice
number is on the front side of the invoice. Thus, we are not persuaded by this argument.

6. No Jury Question on Actual Knowledge

 Although Dana requested a question on Microtherm's actual knowledge of its
disclaimer of warranties, Dana did not seek a jury question on whether Microtherm had
actual knowledge of its limitation of liability provision through receipt of the back side of the
invoice or otherwise, and Dana did not object to the lack thereof. Therefore, there was no
jury finding on Microtherm's actual knowledge of the asserted limitations.


7. Conspicuousness

 Finally, Dana asserts that the limitation provision, found on the back of the invoice,
is conspicuous as a matter of law because it is referred to on the front of the invoice. See
Tex. Bus. & Com. Code Ann. § 1.201(10) (Vernon 2009). We disagree.

 Assuming that conspicuousness applies to a limitation provision as it does to a
disclaimer of warranty provision, "[t]he conspicuous requirement mandates 'that something
must appear on the face of the [contract] to attract the attention of a reasonable person
when he looks at it.'" Dresser Indus. v. Page Petroleum, 853 S.W.2d 505, 508 (Tex. 1993)
(quoting Ling & Co. v. Trinity Sav. & Loan Ass'n, 482 S.W.2d 841, 843 (Tex. 1972)); see
Storage & Processors, Inc. v. Reyes, 134 S.W.3d 190, 192 (Tex. 2004). The following
statement appears on the bottom left-hand corner on the front of the invoice, printed in the
same font and size as all other information on the front of the invoice: "REFER TO REVERSE
SIDE FOR TERMS AND CONDITIONS OF SALE." We cannot conclude, without more, that this
statement would attract the attention of a reasonable person and suggest to that person
that there is a limitation of liability provision on the reverse side. See Dresser Indus., 853
S.W.2d at 508. Therefore, this argument fails.

8. Conclusion Regarding Limitations of Liability

 We conclude, therefore, that Dana did not limit its liability for damages. The record
does not support a conclusion that Microtherm received and accepted, through its course
of conduct, or otherwise, the limitation-of-liability provisions which were found on the back
side of Dana's invoices. Accordingly, we overrule this limitation sub-issue in Dana's first
issue.

B. Evidentiary Issues on Producing Cause

 By a sub-issue in its first issue and by its second issue, Dana generally complains
that the evidence of causation is insufficient to support the verdict. Having concluded that
liability limitations do not apply to Microtherm's DTPA breach of warranty claims, we first
address Dana's evidentiary challenges as they apply to the breach of warranty findings.

 Jury question 3 asked, "Was the failure, if any, of any defendant . . . to comply with
a warranty made, if any, a producing cause of damages to Microtherm[?]" Among other
breaches, the jury found that Dana failed to comply with an express warranty which was
a producing cause of damages to Microtherm. See Tex. Bus. & Com. Code Ann. §
17.50(a)(2) (providing that a consumer may maintain an action where a breach of an
express warranty constitutes a producing cause of economic damages); see also id. §
2.313(a)(1), (b) (Vernon 2009) (providing that an express warranty is "any affirmation of
fact or promise made by the seller to the buyer which relates to the goods and becomes
part of the basis of the bargain" and "[i]t is not necessary . . . that the seller use formal
words such as 'warrant' or 'guarantee' or that he have a specific intention to make a
warranty").

 The jury charge defined "producing cause" as "an efficient, exciting, or contributing
cause that, in a natural sequence, produced the damages, if any. There may be more than
one producing cause." Under producing cause, the plaintiff must prove "actual causation
in fact." Prudential Ins. Co. v. Jefferson Assoc., Ltd., 896 S.W.2d 156, 161 (Tex. 1995). 
Proof of causation-in-fact "requires proof that an act or omission was a substantial factor
in bringing about an injury which would not otherwise have occurred." Id.

 By its first issue, Dana generally contends that even if its liability is not limited, there
is no evidence that its breach of, or failure to comply with, an express warranty was a
producing cause of damages. In its second issue, Dana contends that Microtherm failed
to prove that Dana's conduct was a cause-in-fact of its lost profits or loss of value--that
Dana's conduct was a substantial factor in bringing about an injury which would not
otherwise have occurred.

 "An express warranty is created when a seller makes an affirmation of fact or a
promise to the purchaser that relates to the sale and warrants a conformity to the
affirmation as promised." Head v. U.S. Inspect DFW, Inc., 159 S.W.3d 731, 746 (Tex.
App.-Fort Worth 2005, pet. denied) (citing Humble Nat'l Bank v. DCV, Inc., 933 S.W.2d
224, 233 (Tex. App.-Houston [14th Dist.] 1996, writ denied)). "[W]hen a party fails to
deliver the goods as promised, a breach of contract occurs, but when a seller delivers
nonconforming goods, it is a breach of warranty." Id. at 747 (citing Ellis v. Precision Engine
Rebuilders Inc., 68 S.W.3d 894, 897 (Tex. App.-Houston [1st Dist.] 2002, no pet.)). 
"[T]here are no true DTPA warranties, nor does the DTPA define the term 'warranty.' To
be actionable under the DTPA, a warranty must be established 'independently of the act.'"
Humble Nat'l Bank, 933 S.W.2d at 231 (citing Enterprise-Laredo Assoc. v. Hachar's Inc.,
839 S.W.2d 822, 830 (Tex. App.-San Antonio 1992), writ denied per curiam, 843 S.W.2d
476 (Tex. 1992) (quoting La Sara Grain Co. v. First Nat'l Bank, 673 S.W.2d 558, 565 (Tex.
1984))).

 In this case, Dana does not dispute that it provided an express warranty set out in
its sales invoices--that it would provide thermistors to Microtherm free from defects in
materials and workmanship. See Head, 159 S.W.3d at 746 (citing Parkway Co. v.
Woodruff, 901 S.W.2d 434, 438 (Tex. 1995) (holding that warranties actionable under the
DTPA, both express and implied, must first be recognized by common law or created by
statute)). Dana made an affirmation of fact to Microtherm that related to the sale of the
thermistors and warranted a conformity to the affirmation as promised. See id. Dana does
not challenge the sufficiency of the evidence to prove that it failed to comply with its
express warranty. Therefore, our review of this breach of warranty finding will be limited
to Dana's evidentiary challenges to the producing cause element. Moreover, although
Dana contends the evidence is legally and factually insufficient, it argues only that there
is no producing cause evidence to support the verdict--a legal sufficiency argument.
Therefore, we construe this evidentiary issue as a legal sufficiency challenge.

1. Standard of Review

 When reviewing a record for legal sufficiency where the opposing party has the
burden of proof, we view the evidence in the light most favorable to the verdict to determine
whether the evidence at trial would allow reasonable and fair-minded people to reach the
verdict under review. City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). We "must
credit favorable evidence if reasonable jurors could, and disregard contrary evidence
unless reasonable jurors could not." Id. We will sustain a challenge to the legal sufficiency
of evidence only if: (1) there is a complete absence of evidence of a vital fact; (2) the court
is barred by rules of law or of evidence from giving weight to the only evidence offered to
prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere
scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. Id. at 810. 
More than a scintilla of evidence exists, and the evidence is thus legally sufficient, if the
evidence furnishes some reasonable basis for differing conclusions by reasonable minds
about a vital fact's existence. Lee Lewis Constr. Co. v. Harrison, 70 S.W.3d 778, 782-83
(Tex. 2001). However, "when the evidence offered to prove a vital fact is so weak as to do
no more than create a mere surmise or suspicion of its existence, the evidence is no more
than a scintilla and, in legal effect, is no evidence." Ford Motor Co. v. Ridgway, 135
S.W.3d 598, 601 (Tex. 2004) (citing Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex.
1983)).

2. Expert's Testimony on Causation Challenged

 Dana first challenges the testimony of Elizabeth Trillo, Ph.D., Microtherm's expert,
as unreliable. Dana argues that because Trillo's testimony is incompetent and there is no
other reliable expert testimony, there is no evidence of causation.

 An expert's testimony, to be admissible, must possess a reliable foundation. 
Cooper Tire & Rubber Co. v. Mendez, 204 S.W.3d 797, 800 (Tex. 2006). .
. . Expert testimony is unreliable if it is based on unreliable data, or if the
expert draws conclusions from his underlying data "based on flawed
methodology." Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714
(Tex. 1997).


Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 39 (Tex. 2007). Under Havner, a party may
complain on appeal that scientific evidence is unreliable and constitutes no evidence to
support a judgment. See 953 S.W.2d at 711.

a. Other Causes of Contamination

 As to producing cause, Trillo testified that contamination of the thermistor could
have occurred during the thermistor's assembly process. Dana complains that Trillo's
opinion is unreliable because she failed to rule out other causes of contamination,
specifically a breach of the brass casing that housed the thermistors. Dana asserts that,
because Trillo undertook no testing to rule out this possible source of contamination, her
testimony is unreliable--that it is too unsophisticated to be reliable. See Emmett Props.,
Inc. v. Halliburton Energy Servs., Inc., 167 S.W.3d 365, 373 (Tex. App.-Houston [14th
Dist.] 2005, pet. denied) ("An expert's failure to rule out other causes of the damage
renders his opinion little more than speculation and therefore, unreliable."); see also
Havner, 953 S.W.2d at 720 ("[I]f there are other plausible causes of the injury or condition
that could be negated, the plaintiff must offer evidence excluding those causes with
reasonable certainty."); E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 559
(Tex. 1995) ("An expert who is trying to find a cause of something should carefully consider
alternative causes.").

 In a draft report, Trillo opined that contamination could have occurred during
assembly (manufacturing process); however, she also concluded that "[c]ontamination
could also have been due to a failure of the brass casing of the sender assembly. Under
normal operating conditions, the inside components are isolated from the environment,
however, if there is a breach in the brass casing, contaminants could have been introduced
inside the sender." In this earlier report, Trillo did not say which possibility was more likely.

 At trial, Trillo testified that her draft report mentioned that the casing may have been
breached. She testified that, after discussions with Seitz where he indicated to her that
there were no reports of failures solely due to the casing--"that he never saw any failures,
cracking or otherwise, of the brass casing"--and after examining the springs, she
determined that breach of a casing was not a cause of the failures. Therefore, she
decided to remove that portion of her report. Trillo explained that if the housing had been
breached, the water would have laid along the bottom level resulting in a corrosion line
along the bottom of the spring and through the entire length of the spring. Her inspection
revealed that there was an absence of a trail of corrosion along the entire length of the
spring.

 Although Trillo did not test the casings using electro microscopy, as did Dana's
expert, she did examine the casings and the springs and ruled out breach of a casing as
a cause of the failures. (10) Trillo did not provide a "bare opinion"; this was not solely a
"subjective interpretation of the facts." Volkswagen of Am., Inc. v. Ramirez, 159 S.W.3d
897, 906 (Tex. 2004) (explaining that "[a]n expert's bare opinion will not suffice" and is
unreliable if "based solely upon his subjective interpretation of the facts"). Thus, we cannot
conclude that Trillo's opinion was unreliable on this basis. (11)

b. Sample Size and Extrapolation Testimony

 Trillo examined five thermistors. One thermistor that had not failed was used as a
"control." (12) Of the four remaining thermistors, three had failed and one had not. Dana
contends that Trillo's testimony was unreliable because her sample was too small and
because she provided no foundation for her extrapolation of the failure of three thermistors
to all failed thermistors Dana provided to Microtherm, other than her ipse dixit. See Earle
v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999) ("An expert's simple ipse dixit is insufficient to
establish a matter; rather, the expert must explain the basis of his statements to link his
conclusions to the facts.").

 Trillo's work did not, however, consist only of the examination of five thermistors and
Trillo's ipse dixit, as Dana suggests. Trillo testified that her methodology included (1)
asking questions of Seitz and looking at customer warranty records to understand the
history of the problem including the timing of the failures and their numbers; (13) (2) reviewing
a photograph of a sensor that Dana's expert had cut apart and noting an extensive amount
of rust and red colored deposits that came from the inside of that thermistor; (3) performing
a visual observation of the outside of the sensors; (4) sectioning some of the sensors so
that she could remove the inside components--including a spring, a thermistor, a plastic
sleeve that holds the spring in place, and a rubber O-ring on the backside; (5) performing
an SEM (scanning electron microscope) analysis on several springs; (14) and (6) reviewing
Sada's deposition transcript, which included his April 2001 quality control inspection report
in which Sada "reported that [sic] contaminants throughout the process line in the
assembly of the sensors on most of the parts" and indicated that the problem had not been
resolved by April 2001. Based on the above, Trillo testified that she stated in her report
"that the springs of the sensors had failed due to rust or oxidation process due to
contaminants that were found in the housing. And it is the most likely cause that the
contaminants were present during assembly." At trial, Trillo testified that she provided the
most likely cause or mode of failure in her investigation and that "[l]ooking at a small
sampling of failures and the manner in which [she] did is acceptable."

 Moreover, we are neither persuaded nor bound by the authority upon which Dana
relies for the proposition that Trillo's sample size was too small. See Minnesota Mining &
Mfg. Co. v. Atterbury, 978 S.W.2d 183, 192-93 (Tex. App.-Texarkana 1998, pet. denied)
(discussing the precedent on expert witness testimony in silicone cases including Kelley
v. Am. Heyer-Shulte Corp., 957 F. Supp. 873, 879 (W.D. Tex. 1997), where the federal
court excluded an expert witness because her conclusions were based only on unreliable
studies, one of which was unreliable due to, among other things, its small sample size of
445); Mitchell Energy Co. v. Bartlett, 958 S.W.2d 430, 446-48 (Tex. App.-Fort Worth 1997,
pet. denied) (concluding that test results which showed hydrogen sulfide present in two of
the wells on a single day and absent a month later, was no more than a scintilla of
evidence, and, thus, legally insufficient to establish causation). Trillo's opinion regarding
causation was not based solely on an unreliable study of another or on a bare conclusion
alone without supporting facts. See Atterbury, 978 S.W.3d at 192-93; Mitchell Energy, 958
S.W.2d at 447 (citing Havner, 953 S.W.2d at 711). Her conclusion was based on historical
facts, photographs of testing performed by Dana's expert, her own thermistor tests, and
Sada's deposition testimony and his April 2001 report.

 Therefore, we cannot conclude that Trillo's opinion regarding the failure of the
thermistors was unreliable because her sample was small. Neither can we conclude that
her opinion was unreliable because her extrapolation of the failure of the five sampled
thermistors to all failed thermistors was without foundation. (15)

3. No Other Evidence of Causation

 Dana argues that, without Trillo's testimony, there is no evidence to support the
findings that Dana's breach of its express warranty was a producing cause of Microtherm's
damages. Having determined that Trillo's testimony is reliable, this contention fails.

 Nonetheless, there is also evidence that Dana's own January 2001 8-D corrective
action report found that the thermistors were contaminated and "out of spec," and Sada's
internal April 2001 report reflects continued contamination problems during the assembly
process. In addition, Seitz testified that "[t]he sensors stopped giving reliable temperature
measurement and so the heaters failed."

 Referring to the above reports, Dana argues that Microtherm's causation case
cannot rest on Dana's own reports and internal evaluations and policies to substitute for
the needed expert testimony. However, the cases relied upon by Dana, FFE
Transportation Services, Inc. v. Fulgham and Fenely v. Hospice in the Pines, do not
support this proposition. They provide only that a company's self-imposed policies do not
establish the standard of care and cannot be substituted as the industry's standard of care
in determining a breach. See FFE Transp. Servs., Inc. v. Fulgham, 154 S.W.3d 84, 92-93
(Tex. 2003); Fenely v. Hospice in the Pines, 4 S.W.3d 476, 481 (Tex. App.-Beaumont
1999, pet. denied). 

 In this case, Trillo did not use Dana's self-imposed policies, reports, and internal
evaluations to establish the standard of care. She did not substitute Dana's quality control
reports for the industry's standard. Trillo provided expert testimony on causation. She
reviewed Dana's own reports on quality control and its internal evaluations and used
information from the reports to provide support for her opinion on causation. Neither case
relied upon by Dana addresses the application of internal reports, evaluations, and policies
to a determination of causation. Neither case supports a conclusion that Microtherm's
expert cannot consider Dana's 8-D correction report or the April quality control report in
arriving at an opinion on causation. Whether or not corrective actions were taken at
Dana's assembly plant pursuant to a company policy which did or did not exceed the
existing standard of care, the evidence established there was contamination in the
assembly of the thermistors, which according to Trillo, was a producing cause of the failure
of the thermistor.

4. Contrary Evidence

 After contending Microtherm did not prove that Dana's act or omission was a
substantial factor in bringing about an injury which otherwise would not have occurred,
Dana appears to raise a City of Keller challenge. See 168 S.W.3d at 827. Dana generally
asserts that, to the contrary, the evidence shows that even after installation in Microtherm's
water heaters, the temperature senders were easily replaced. Without citation to the
record, Dana urges that there is other contrary evidence showing that: (1) a failure of a
temperature sender did not cause any other damage to the user's property, and (2)
Microtherm had significant failures in other components--and had called damages flowing
from the other components "irreparable." In our legal sufficiency review, however, we
cannot conclude that this alleged contrary evidence could not have been disregarded by
reasonable jurors in determining whether Dana's act or omission was a substantial factor
in bringing about an injury which would not otherwise have occurred. See id.

5. Conclusion Regarding Producing Cause

 Therefore, viewing the evidence in the light most favorable to the verdict, and
crediting favorable evidence if reasonable jurors could and disregarding contrary evidence
unless reasonable jurors could not, we conclude that there was more than a scintilla of
evidence to establish producing cause. See id. at 810, 823; Harrison, 70 S.W.3d at
782-83. The evidence was legally sufficient to establish that Dana's breach of express
warranty was a producing cause of Microtherm's damages--Dana's act or omission was
a substantial factor in bringing about an injury which would not otherwise have occurred. 
We overrule Dana's sub-issue in its first issue and Dana's second issue challenging the
legal sufficiency of the evidence to support the verdict.

C. Evidentiary Challenge to "Knowingly" Finding

 In its first issue, Dana contends, by a sub-issue, that there is no evidence that Dana
knowingly supplied defective thermistors to Microtherm. Dana asserts that the evidence
is not sufficient to show that Dana had actual awareness that it was supplying defective
thermistors to Microtherm.

 In response to question 5, the jury found that Dana's failure to comply with its
express warranty was committed knowingly. In relevant part, the charge defined
"knowingly" as "actual awareness of the conduct constituting a failure to comply with a
warranty" and instructed the jury that "[a]ctual awareness may be inferred where objective
manifestations indicate that a person acted with actual awareness." (16) See Tex. Bus. &
Com. Code Ann. § 17.45(9) (Vernon Supp. 2008); see id. § 17.50(a)(2); K.C. Roofing Co.
v. Abundis, 940 S.W.2d 375, 377 (Tex. App.-San Antonio 1997, writ denied) (noting actual
awareness may be inferred from the surrounding circumstances). "The burden is on the
plaintiff to prove that the defendant acted knowingly." CA Partners v. Spears, 274 S.W.3d
51, 74-75 (Tex. App. Houston 14th Dist. 2008, pet. denied).

 Although Dana asserts that there is no evidence that it knowingly supplied defective
thermistors to Microtherm, we conclude that the following evidence supports the
"knowingly" finding:


 Seitz testified that early in November 2000 Microtherm informed Dana of the
problems that Microtherm was seeing with the thermistors.

 Sada, one of Dana's quality control engineers, confirmed that Dana received
Microtherm's complaint and informed Microtherm that a product engineer was
evaluating the sample and the reported problem and was exploring, among other
things, possible contamination of the thermistor.

 In January 2001, Dana communicated to Seitz, verbally and through a January 1,
2001 8-D Correction Action report, that it had reviewed the thermistor sent to Dana
by Microtherm and was going to correct the problems at their facility with respect to
contamination on the thermistors.

 The January 8-D corrective action report found the "root cause" of the defect to be
that the sensors were "out of spec" and the housing and thermistor were
contaminated. To contain the problem it was recommended that, effective January
4, 2001, all bad thermistors be sent back to the supplier with a request for
immediate corrective action, that a new shipment of thermistors "within spec" be
sent as soon as possible to meet the production schedule, and that a new Quality
Alert Notice be sent for the test station and process inspection to check for drifting
thermistors. To correct the problem, the report recommended the following: (1)
inspecting all thermistors before assembly and checking their resistance; (2)
cleaning the thermistors with sandpaper and alcohol; (3) cleaning inside the
housing; and (4) updating the process sheets to reflect the new requirements for the
thermistor check. This permanent corrective action was to be effective with the
"next production schedule."

 Sada testified that on April 11, 2001, as instructed by Teresa Salazar, Dana's
quality manager and the person to whom Sada reported, he submitted a report
regarding Microtherm's complaint. Sada also testified that he had inspected the
assembly line and noted that component parts were stored in open places where
there was dirt and filth, that assemblers were not using latex gloves to prevent the
transfer of contaminants from their hands to the finished product, and that the
conditions that existed on the assembly lines could allow these thermistors or their
component parts to be contaminated by oil, dust, dirt, humidity, oxidation, or other
particles. In the April report, Sada made several recommendations to provide better
control of the cleaning operation to prevent contamination which he believed was
the most probable cause of the failures--"loose contacts due to contaminants
between the thermistor and the bottom of the housing, or between the terminal or
the spring due to defects in the parts material or finish."

 Sada also indicated in his report that on April 9, 2001, he had run a test with 25
sensors with the housings previously cleaned very carefully using q-tips and the
thermistor cleaned with a clean cloth and found all samples to be within
specification at ambient and at 220F. Angelica Lopez believed that a 100 piece
run would be more representative and could provide better results. She was going
to request authorization to build 100 pieces with extreme precautions of cleaning the
housing and thermistor. At the time of Sada's report, Lopez had not built the
samples.

 Sada testified that he sent his report to Salazar, but did nothing to solve these
problems. He did not implement any procedures to correct what he saw when he
observed the people on the assembly line.

 Seitz testified that Sada indicated Dana "really never did what they said they were
going to do to correct or attempt to correct the problem." Seitz testified that despite
the January 1, 2001 and April 11, 2001 reports which showed contamination as the
most probable cause of the failures, Dana did not fix any of the problems.

 In August 2001, Seitz informed Carmine Auditore, the manager at Dana's plant
where the thermistors were assembled, about failures that were occurring with the
thermistors.

 Auditore acknowledged that he may have read Sada's April 2001 report and set it
aside or filed it. But that did not mean that he would remember it.

 Auditore also testified that it was possible that he did not read the January 2001
report. The first time he recalled reading the report was after Seitz called him in
August 2001, and they discussed that issue--eight months after the January report
was issued and four months after the April report was issued. He believed that
things were being done correctly, even based on April report.

 Dana's summary of sales to Microtherm from January 1, 2000, through June 12,
2002, admitted as plaintiff's exhibit 12.13, showed that Dana continued to sell
thermistors to Microtherm throughout 2001, including 3000 thermistors on April 19,
2001, 3000 on May 4, 2001, 2500 on July 7, 2001, and 2000 on October 5, 2001.



 Based on the above, we conclude that the record contains some evidence that Dana
knowingly engaged in conduct that breached the express warranty. City of Keller, 168
S.W.3d at 827; Harrison, 70 S.W.3d at 782-83. Dana knew it had warranted that the
thermistors would be free from defects. Seitz's testimony establishes that he engaged in
conversations with Dana in November 2000 discussing failures in thermistors that Dana
provided. Through its January report, Dana confirmed that Microtherm had reported
defects in the thermistors--that the "[t]hermistors [would] not stay in line or drift." Dana told
Seitz, through the January 2001 report and through verbal communication, that it was
going to correct the problems at its facility with respect to contamination on the thermistors. 
Dana's January 2001 report and its April 2001 report noted that contamination was
apparent in the samples tested and, in the April 2001 report, that problems still existed at
the assembly plant.

 However, Sada testified that, although he provided his manager with his April report,
he did not follow-up on his recommendations. Apparently, no further testing was done
although Sada reported in April 2001 that cleaner assembly of twenty-five thermistors
resulted in a product that was in spec and that further inspection of a larger sample was
suggested. Dana did not provide Sada's April 2001 report to Microtherm. Seitz also
testified that Sada indicated that Dana "really never did what they said they were going to
do to correct or attempt to correct the problem." In August 2001, Seitz talked with Auditore
about the failures occurring with the thermistors. Auditore testified that he did not read the
reports or did not remember them and that his plant was fine even before the April report
was issued. Dana continued to supply thermistors to Microtherm until October 2001; the
thermistors were assembled under conditions that apparently had not changed. From the evidence, the jury could have concluded that after November 2000, Dana
was aware its thermistors were contaminated and failed to provide proper resistance. The
jury could have inferred that Dana continued to supply defective thermistors to Microtherm
knowing that the problems with their assembly had not been corrected. A reasonable fact
finder could infer from the objective manifestations and surrounding circumstances that
Dana continued to provide thermistors with "actual awareness" that the thermistors were
defective. Therefore, viewing the evidence in the light most favorable to the verdict, we
conclude the evidence is legally sufficient to support the jury's finding that Dana knowingly
failed to comply with its express warranty. City of Keller, 168 S.W.3d 827. We overrule
Dana's sub-issue in its first issue that challenges the jury's knowingly finding.

 Because we conclude that the judgment can be sustained on Microtherm's breach
of warranty theory, we need not address Dana's challenges to the jury's remaining DTPA
liability findings. (17) They are not dispositive of this appeal. See Tex. R. App. P. 47.1.


IV. Challenges to Damage Findings After finding that Dana, Puget, and UPG failed to comply with their respective
warranties, the jury was asked to determine what sum of money from each of the
defendants would compensate Microtherm for its damages that resulted from the conduct. 
The charge instructed the jury to consider, among others, (1) lost profits sustained in the
past and, in reasonable probability, will be sustained in the future; and (2) damage, if any,
to the value of Microtherm. As to each element, the jury was instructed to answer
separately in dollars and cents, if any, for Dana, Puget, and UPG. The jury awarded
divisible damages for lost profits, past and future, in the amount of $12,400,000 against
Dana, $7,340,000 against Puget, and $5,850,000 against UPG and divisible damages for
lost value in the amount of $15,000,000 against Dana, $15,000,000 against Puget, and
$11,500,000 against UPG.

A. Divisible or Indivisible Damages

 Before considering Dana's evidentiary challenges to the DTPA damages awarded
against it, we must address a threshold argument raised by Microtherm. By what we
construe as a cross-issue, Microtherm contends that the trial court erred in determining that
the damages were divisible rather than indivisible. (18) Microtherm asserts that "it is clear that
the losses sustained by Microtherm are precisely the type of indivisible injuries that, under
Texas law, would give rise to joint and several liability," and "[g]iven the timing of the Dana
failures, which occurred in both 2000 and 2001, there can be no doubt but that
Microtherm's damages are indivisible as between Dana, on the one hand, and Emerson,
Puget, and/or UPG, on the other hand." Microtherm argues that "[t]he trial court's
'divisibility' ruling, i.e., that Microtherm had to prove damages severally as to each
defendant, is patently wrong." In response, Dana contends that because Microtherm
moved to enter judgment on the verdict and proposed that it recover on the basis of the
divisible damages awarded, Microtherm may not take this inconsistent position on appeal. 
We agree.

 Before the jury trial began, the court ruled that damages were divisible. (19) At the end
of Microtherm's case, the trial court directed a verdict that the parties were responsible only
for damages, if any, caused by their own conduct. Consistent with the trial court's rulings,
the charge submitted divisible damage questions. (20) Although Microtherm took the position
throughout trial that its damages were indivisible, after receiving a favorable verdict from
the jury on its DTPA claims, Microtherm filed an unqualified motion for entry of the
judgment. In its motion, Microtherm moved the trial court to "enter judgment on the verdict"
and prayed for the same. Microtherm attached a proposed judgment to its motion. All jury
questions and answers were made part of the proposed judgment, including the divisible
damage questions and answers. Microtherm also proposed the following decretal
language:


 It is ordered, adjudged and decreed that . . . Microtherm shall recover from
. . . Dana . . . the sum of Twenty Seven Million Six Hundred Thousand and
No/100 Dollars ($27,600,000.00) actual damages for violation of the Texas
Deceptive Trade Practices Act and Two Hundred Fifty Thousand and no/100
Dollars ($250,000.00) as additional damages for knowingly committing a
violation of the Texas Deceptive Trade Practices Act.


Microtherm's proposed judgment further set out that it shall be awarded, as against Dana,
pre-judgment interest in the amount of $3,338,465.75 and post-judgment interest at the
rate of 5% per annum from the date of the judgment until the judgment is paid.

 The trial court entered final judgment based on Microtherm's proposed judgment. 
The final judgment includes the same divisible damage questions and jury answers. The
final judgment awards identical divisible damages against Dana in the amount of
$27,600,000 in actual damages and $250,000 as additional damages. Similarly, the
judgment awards $3,308,712.33 as pre-judgment interest on past actual damages of
$27,200,000 and post-judgment interest at the rate of 5% per annum until the judgment
is paid.

 When a party moves for entry of judgment, and the trial court enters the judgment,
the party cannot later complain of that judgment. Casu v. Marathon Ref. Co., 896 S.W.2d
S.W.3d 388, 389 (Tex. App.-Houston [1st Dist.] 1995, writ denied); see Gammage, 668
S.W.2d at 322 ("We disapprove a practice by which a party, by motion, induces the trial
court on the one hand to render a judgment, but reserves in a brief the right for the movant
to attack the judgment if the court grants the motion."); JCW Elecs., Inc. v. Garza, 176
S.W.3d 618, 628 (Tex. App.-Corpus Christi 2005), rev'd on other grounds, 257 S.W.3d
701 (Tex. 2008) ("[W]hen a party files a motion for entry of judgment, that party cannot
take a position on appeal that is inconsistent with that part of the judgment."); accord
Northeast Tex. Motor Lines, Inc. v. Hodges, 138 Tex. 280, 158 S.W.2d 487, 488 (Tex.
1942) (explaining that because a party presented two charge issues together, it cannot be
heard to complain that court chose the issue that was more onerous to it and concluding
that "a litigant cannot ask something of a court and then complain that the court committed
error in giving it to him. The rule, grounded in even justice and dictated by common sense,
is that he is estopped."); D/FW Commercial Roofing Co. v. Mehra, 854 S.W.2d 182, 190
(Tex. App.-Dallas 1993, no writ) (holding that the plaintiff waived a complaint regarding the
amount awarded as attorneys' fees where the plaintiff filed a motion to enter judgment and
the trial court entered judgment for the exact sum requested by the plaintiff in the motion);
cf. Miner-Dederick Const. Corp. v. Mid-Cty Rental Serv. Inc., 603 S.W.2d 193, 198 (Tex.
1980) (holding that an appellee moving for judgment on one interpretation of jury's findings
was entitled to complain that findings based on another interpretation were against the
preponderance of the evidence); Green v. Tex. Workers' Comp. Inc. Facility, 993 S.W.2d
839, 843-44 (Tex. App.-Austin 1999, pet. denied) (concluding that a plaintiff moving for
judgment on the jury's verdict on the basis that he was entitled to lifetime medical benefits
did not waive a challenge to the jury's failure to find any partial or total incapacity as a
result of that occupational disease). Moreover, "where the litigant moves the trial court to
enter a judgment, and the trial court enters the judgment, the litigant cannot later complain
of that judgment, period." Casu, 896 S.W.3d at 391 (citing Transmission Exch., Inc. v.
Long, 821 S.W.2d 265, 275 (Tex. App.-Houston [1st Dist.] 1991, writ denied) (holding that
cross-appellant waived its point of error concerning a duty to mitigate by moving for entry
of the final judgment that the court entered). "To preserve the right to complain about a
judgment on appeal, a movant for judgment should state in its motion to enter judgment
that it agrees only with the form of the judgment, and note its disagreement with the
content and result of the judgment." Id. at 390 (citing First Nat. Bank of Beeville v. Fojtik,
775 S.W.2d 632, 633 (Tex. 1989) (per curiam)).

 Microtherm's motion for entry of judgment was unqualified. The motion asked for
entry of judgment on the verdict. Microtherm did not agree only as to form and did not note
any disagreement with the content or result of the judgment it asked the trial court to enter. 
See id. More specifically, the motion did not express any disagreement with the trial court's
characterization of damages as divisible rather than indivisible. Microtherm was required
to qualify its request for judgment accordingly. See Fojtik, 775 S.W.2d at 633. It did not
do so and is, therefore, bound by the terms of the judgment. See Casu, 896 S.W.3d at
392. Microtherm cannot, on appeal, take a position inconsistent with its request for
judgment on the basis of the divisible damages awarded. See Litton, 668 S.W.2d at
321-22, 27; Garza, 176 S.W.3d at 628. We conclude, therefore, that even if the trial court
erred in ruling that the damages were divisible, by unqualifiedly requesting entry of
judgment on the divisible damage findings, Microtherm abandoned its claim that the
damages are indivisible and that the trial court's divisibility ruling is patently wrong. We
overrule Microtherm's cross-issue. (21)

B. Sufficiency of the Evidence to Support 

Lost Profits Award and Lost Value Award


 In its third issue, Dana asserts that the separate $12.4 million lost profits damages
awarded against Dana and the separate $15 million loss in value damages awarded
against it have no support in the record. (22) Dana contends that the evidence is legally
insufficient because Microtherm failed to make any proof of separate damages to the jury. 

Microtherm's principal argument in response to this evidentiary challenge is that damages
are indivisible, not divisible, and that it could not determine the amount of damages caused
by Dana because of the combination of failures of the various component parts of the
Seisco product. However, as discussed above, Microtherm abandoned this inconsistent
position when it requested judgment on the verdict, without exception, and Microtherm
cannot, now, assert the same argument in support of its contentions regarding the
sufficiency of the evidence of separate damages.

1. No Evidence of Separate Damages Caused by Dana

 It is undisputed that Microtherm presented no evidence of defendant-by-defendant
damages. (23) Microtherm knew when the trial began that the case was being tried on
separate damages, and Microtherm had the opportunity to present evidence of separate
damages. The trial court asked the jury to find an amount of lost profits and an amount of
lost value caused by Dana, a separate amount caused by Puget, and a separate amount
caused by UPG. The verdict awarded separate damages on a defendant-by-defendant
basis. Yet, Microtherm did not provide any evidence as to what amount of the total
damages was caused by Dana. Thus, reviewing the evidence presented at trial in the light
most favorable to the jury's verdict, crediting evidence favorable to that party if reasonable
jurors could and disregarding contrary evidence unless reasonable jurors could not, we
conclude that the evidence was legally insufficient to support the divisible lost profit
damages and the divisible lost value damages awarded against Dana. See City of Keller,
168 S.W.3d at 827.

2. Remittitur or Rendition of Judgment

 Microtherm argues that, even if this Court concludes that the evidence is insufficient
to support the amount of damages attributed to Dana, the most Dana would be entitled to
would be a remittitur or a new trial--not a rendition of judgment. Microtherm asks us to
apply the analysis utilized by the courts in Formosa Plastics Corp. USA v. Presidio
Engineers & Contractors, Inc. and in the line of cases represented by Texarkana Mem.
Hops., Inc. v. Murdock. See Formosa Plastics, 960 S.W.2d 41, 51 (Tex. 1998); Murdock,
946 S.W.2d 836, 839-41 (Tex. 1997); Minn. Mining & Mfg. Co. (3M) v. Nishika LTD., 953
S.W.2d 733, 738-40 (Tex. 1997); Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10-12
(Tex. 1991), modified on other grounds by Tony Gullo Motors I v. Chapa, 212 S.W.3d 299,
313-14 (Tex. 2005). We decline to do so, concluding instead that such an analysis and
disposition is not applicable in this case.

 In Formosa Plastics, the court concluded that Presidio failed to present legally
sufficient evidence to support the entire amount of damages--$700,000--awarded. 960
S.W.2d at 43, 51. The court also concluded that there was clearly legally sufficient
evidence that Presidio suffered some damages as a result of Formosa's fraud, including
an out-of-pocket damage award of $231,000 or a benefit-of-the-bargain damage award of
$461,000. Id. at 51. Because there was some evidence of the correct measure of
damages and because the issue of damages was contested by Formosa, the supreme
court could not render judgment in favor of Presidio for a lesser amount. Id. Instead, the
court reversed that judgment and remanded the cause for a new trial. See id. (citing
Murdock, 946 S.W.2d at 841).

 Even though the Formosa court found no evidence supporting the $700,000 fraud
damages awarded against Formosa, it did find Presidio had presented some evidence of
the amount of damages caused by Formosa's fraud, including the $231,000 out-of-pocket
damage award and the $461,000 benefit-of-the-bargain award. See id. In the present
case, Microtherm failed to present any evidence of the amount of damages, if any, caused
by Dana, distinguishing this case from Formosa.

 Additionally, in Murdock, 3M, and Sterling, each respective jury was asked to award
indivisible damages. See Murdock, 946 S.W.2d at 839-41; 3M, 953 S.W.2d at 738-40;
Sterling, 822 S.W.2d at 10-12. The supreme court determined, in each case, that the
indivisible damages could have, and therefore should have, been proven as separate or
divisible damages. See Murdock, 946 S.W.2d at 839-41; 3M, 953 S.W.2d at 738-40;
Sterling, 822 S.W.2d at 10-12. In each case, the court concluded that evidence of the
indivisible or total damage was evidence of the segregated or divisible damage. See
Murdock, 946 S.W.2d at 839-41; 3M, 953 S.W.2d at 738-40; Sterling, 822 S.W.2d at 10-12. Each case was remanded to afford the plaintiffs with the opportunity to develop their
separate damages evidence. See Murdock, 946 S.W.2d at 839-41; 3M, 953 S.W.2d at
738-40; Sterling, 822 S.W.2d at 10-12.

 In the present case, the jury was asked to award divisible or separate damages, not
indivisible or total damages. And it did exactly that. Unlike Murdock, 3M, and Sterling,
where the courts remanded the cases so that the plaintiffs would have the opportunity to
prove up separate damages, Microtherm had both the opportunity and the burden at trial
to develop its damages--divisible among the defendants. It did not. Microtherm
inexplicably offered no such proof to the jury; it provided no evidence of the divisible
damages awarded. Microtherm tried its case with proof of indivisible-injury damages, but
the charge required proof of divisible, defendant-by-defendant damages. Unlike the parties
in Murdock, 3M, and Sterling, Microtherm was given the opportunity and was compelled
by the structure of the jury charge and prior rulings of the trial court to present evidence of
divisible damages but wholly failed to do so.

 We sustain Dana's third issue regarding lost profit and lost value damages awarded
for Microtherm's DTPA claims.

V. Fraud

 By a sub-issue in its first issue, Dana contends that, if reached, the jury's fraud
findings will not support a judgment. Because we are modifying the DTPA damage award,
Microtherm may choose on remand to recover under the fraud claim based on our
resolution of Dana's damage issue. See Gunn Infiniti, Inc. v. O'Byrne, 18 S.W.3d 715, 718
(Tex. App.-San Antonio 2000, no pet.) (remanding to permit O'Byrne to make a new
election of remedies (DTPA or fraud) based on the appellate court's resolution of the
issues considered in the opinion). Therefore, we review Dana's challenge to the sufficiency
of the evidence supporting the jury's fraud findings.

A. Fraud Liability Findings

 Jury question 9 asked, "Did any of the Defendants . . . commit fraud against
Microtherm?" The charge instructed the jury as follows:

 Fraud occurs when


 a. a party makes a material misrepresentation,


 b. the misrepresentation is made "with knowledge" of its falsity or
made recklessly without any knowledge of the truth and as a
positive assertion,


 c. the misrepresentation is made with the intention that it should
be acted on by the other party, and


 d. the other party acts in reliance on the misrepresentation and
thereby suffers injury.


The charge defined "[m]isrepresentation" as "a false statement of fact," "a promise of
future performance made with an intent, at the time the promise was made, not to perform
as promised," "a statement of opinion based on a false statement of fact," "a statement of
opinion that the maker knows to be false," or "an expression of opinion that is false, made
by one claiming or implying to have special knowledge of the subject matter of the opinion." 
The jury found that Dana committed fraud based on each definition given.

 Dana contends that there is no evidence that it made representations with the intent
to deceive and with no intention of performing its contract as represented. See Formosa
Plastic, 960 S.W.2d at 47-48 (providing that the mere failure to perform a contract is not
evidence of fraud; rather, the plaintiff must present evidence that the defendant made
representations with the intent to deceive and with no intention of performing as
represented). Moreover, Dana asserts that there is no evidence that Dana made a
material misrepresentation with knowledge of its falsity, or recklessly without any
knowledge of truth, with the intention that it be acted on by Microtherm. Dana also asserts
that there is no evidence that Microtherm acted in reliance on any such misrepresentation
and thereby suffered injury.

 We conclude, however, that the evidence discussed above is sufficient to show (1)
that Dana made material misrepresentations regarding whether it was going to take, or had
taken, corrective actions, (2) that Dana did so with knowledge of the falsity of those
statements, (3) that Dana did so with the intent that Microtherm should act on the
misrepresentation, and (4) that Microtherm relied on Dana's misrepresentations by
continuing to purchase thermistors from Dana.

 The jury agreed with Microtherm and found that Dana committed fraud. Considering
all the record evidence in a light most favorable to Microtherm and indulging every
reasonable inference deducible from the evidence in Microtherm's favor, there is more than
a scintilla of evidence to support the fraud finding. See id. at 48. Thus, we conclude that
Microtherm presented legally sufficient evidence that Dana made representations with no
intention of performing as represented in order to induce Microtherm into continuing to
purchase thermistors from Dana. See City of Keller, 168 S.W.3d at 823. Accordingly, we
overrule Dana's sub-issue in its first issue that challenges the jury's fraud liability finding.


B. Fraud Damage Findings

 Furthermore, Dana incorporates its DTPA damages argument into its contention that
the jury's award of divisible fraud damages against Dana, including $725,000 for lost profits
and $500,000 in lost value, is not supported by the evidence. We apply the same analysis
to the divisible or separate fraud damage findings that we applied to the DTPA damage
findings and, accordingly conclude that the evidence is legally insufficient to support the
challenged award of lost profits and lost value damages against Dana resulting from fraud. 
See id. We sustain Dana's first and third issues to the extent they address fraud damages
for lost profits and lost value awarded against it.

 Additionally, we note that while Dana attempts to incorporate its DTPA damages
argument into its contention that the jury's $250,000 award of divisible fraud damages
against Dana for repair and replacement costs is not supported by the evidence, Dana
addresses only lost profits and lost value in its earlier argument. Therefore, we find no
argument with citations to authorities and to the record that supports this contention. See
Tex. R. App. P. 38.1(i) (providing that "[t]he brief must contain a clear and concise
argument for the contentions made, with appropriate citations to authorities and to the
record"). Furthermore, Dana does not challenge the jury's finding that there was clear and
convincing evidence that the harm to Microtherm resulted from the fraud found or the jury's
$330,000 exemplary damages award based on the fraud findings.

VI. Attorneys' Fees

 After a hearing on attorneys' fees, the trial court ordered that Microtherm recover
reasonable and necessary attorneys' fees from Dana in the amount of $12,463,485
through the trial level. (24) By its fourth issue, Dana contends that the evidence supporting
the trial court's award of attorneys' fees was insufficient because the proof did not comply
with the principles of Arthur Andersen & Co. v. Perry Equip. Corp. See 945 S.W.2d 812,
817-19 (Tex. 1997). In response, Microtherm contends that the evidence was sufficient
because it did comply with Arthur Andersen.

 A plaintiff who prevails in a DTPA cause of action "shall be awarded court costs and
reasonable and necessary attorneys' fees." Tex. Bus. & Com. Code Ann. § 17.50(d)
(Vernon Supp. 2008). "One of the factors in determining the reasonableness of an award
of attorneys' fees is the amount of damages awarded." Allison v. Fire Ins. Exch., 98
S.W.3d 227, 262 (Tex. App.-Austin 2002, pet. granted, judgm't vacated w.r.m.) (citing
Wayland v. City of Arlington, 711 S.W.2d 232, 233 (Tex. 1986) (per curiam)). This,
however, is only one among many factors to consider. See Arthur Andersen, 945 S.W.2d
at 818 (identifying the following eight factors that a trial court may consider in determining
the reasonableness of an attorneys' fee award: (1) the time and labor required, the novelty
and difficulty of the questions involved, and the skill required to perform the legal service
properly; (2) the likelihood that the acceptance of the particular employment will preclude
other employment by the lawyer; (3) the fee customarily charged in the locality for similar
services; (4) the amount involved and the results obtained; (5) the time limitations imposed
by the client or by the circumstances; (6) the nature and length of the professional
relationship with the client; (7) the experience, reputation, and ability of the lawyer or
lawyers performing the services; and (8) whether the fee is fixed or contingent on results
obtained or uncertainty of collection before the legal services have been rendered); see
also Gill Sav. Ass'n v. Int'l Supply Co., 759 S.W.2d 697, 703-04 (Tex. App.-Dallas 1988,
writ denied) (detailing twelve factors normally used in determining reasonableness of award
of attorneys' fees). A trial judge's decision to award attorneys' fees under the DTPA is
reviewed under an abuse of discretion standard. Bohls v. Oakes, 75 S.W.3d 473, 480
(Tex. App.-San Antonio 2002, pet. denied); see Tex. Bus. & Com. Code Ann. § 17.50(d). 
The factors governing the assessment of attorneys' fees are the same whether awarded
by the trial court or the jury and include consideration of the "results obtained." Young v.
Qualls, 223 S.W.3d 312, 314 (Tex. 2007) (per curiam) (quoting Arthur Andersen, 945
S.W.2d at 818).

 In this case, the trial court found that Microtherm's attorneys' fees expert, Fred
Hagans, addressed all of the elements the fact finder is asked to consider in Andersen and
that Hagans's testimony was detailed and credible. See Vingcard A.S. v. Merrimac
Hospitality Sys., Inc., 59 S.W.3d 847, 870 (Tex. App.-Fort Worth 2001, pet. denied)
(concluding that a jury award of dollar amount based on contingent fee, after hearing
testimony, met the Arthur Andersen requirements). Although the trial court found "[t]hat
the jury found . . . Dana . . . violated the [DTPA] and caused actual damages to Microtherm
in the amount of $27,600,000," and that " based on the evidence, the elements the fact
finder is asked to consider in . . . Arthur Andersen . . . , and the jury findings, . . .
Microtherm has proven reasonable, necessary, and customary attorneys' fee[s] from . . .
Dana . . . in the amount of $12,463,485," we cannot say that the attorneys' fee award of
$12,463,485 million is still reasonable, given that we have significantly reduced the
damages awarded by the jury. See rePipe, Inc. v. Turpin, 275 S.W.3d 39, 51 (Tex.
App.-Houston [14th Dist.] 2008, no pet.). Taking into account the difference between the
erroneous award and what we have determined is the correct award of damages, we
cannot be reasonably certain that the trial court was not significantly influenced by the
erroneous damage amounts it considered. See id. (citing Bossier Chrysler-Dodge II, Inc.
v. Rauschenberg, 238 S.W.3d 376, 376 (Tex. 2007) (per curiam) (explaining that if
damages are reduced, attorneys' fees should ordinarily be retried unless the appellate
court is "reasonably certain that the jury was not significantly influenced by the erroneous
[damage award]" (quoting Barker v. Eckman, 213 S.W.3d 306, 314 (Tex. 2006))); see
Young, 223 S.W.3d at 313 (per curiam) (remanding case for retrial of the attorneys' fees
issues after party timely filed the suggested remittitur). We sustain Dana's fourth issue on
this basis. (25)

VII. Charge Error

 By its fifth issue, Dana complains of charge error. However, having sustained the
third issue on lost profits and lost value awards, Dana's contentions regarding mitigation
and probable and foreseen damages instructions are not dispositive of this appeal, and we
need not address them. See Tex. R. App. P. 47.1.

VIII. Cross-Appellant Seitz's Individual Claims

 At the close of the plaintiffs' case, the court dismissed Seitz's individual claims
against Dana on Dana's motion for directed verdict. By a cross-issue, Seitz contends that
his breach of express and implied warranty claims, his DTPA claims, and his negligence
claim against Dana should be reinstated.

A. Standard of Review

 When reviewing a directed verdict on a legal issue, we consider all the evidence
presented at trial, viewing it in the losing party's favor as much "as the record allows." S.V.
v. R.V., 933 S.W.2d 1, 8 (Tex. 1996). The reviewing court may affirm a directed verdict
even if the trial court's rationale for granting the directed verdict is erroneous, provided it
can be supported on another basis. Kelly v. Diocese of Corpus Christi, 832 S.W.2d 88,
90 (Tex. App.-Corpus Christi 1992, writ dism'd w.o.j.).

B. Breach of Express and Implied Warranty Claim

 Although not a party to a contract with Dana, Seitz contends that he, in his individual
capacity, should recover economic loss from Dana for breach of the express and implied
warranties of merchantability and fitness associated with Dana's thermistors. Dana asserts
that because Seitz is in "horizontal privity," he cannot claim economic losses resulting from
a breach of warranty. Under the facts of this case, we agree.

 There are two types of privity of contract, vertical and horizontal. "Vertical privity"
includes all parties in the distribution chain from the initial supplier of the product to the
ultimate purchaser. Garcia v. Tex. Instruments, Inc., 610 S.W.2d 456, 463-64 (Tex. 1980). 
"Horizontal privity" is described as the relationship between the original supplier and any
non-purchasing party who uses or is affected by the product, such as the family of the
ultimate purchaser or a bystander. Id. The Texas Legislature "has delegated the question
of privity to our courts." Id. at 464-65; see Tex. Bus. & Com. Code Ann. § 2.318 (Vernon
2009) (providing that this chapter is neutral on need for privity of contract). "Two
preeminent Texas Supreme Court cases have addressed who may sue for breach of
implied warranty other than the immediate purchaser of a product." Hou-Tex, Inc. v.
Landmark Graphics, 26 S.W.3d 103, 108 (Tex. App.-Houston [14th Dist.] 2000, no pet.).

 In Nobility Homes of Texas, Inc. v. Shivers, a case of vertical privity, Shivers, the
owner of a defective mobile home, sued its manufacturer for economic loss under an
implied warranty. 557 S.W.2d 77, 77 (Tex. 1977). Although Shivers was not the direct
purchaser from the manufacturer of the mobile home, he was the ultimate purchaser in the
distribution chain. See id. The supreme court held "that a manufacturer can be
responsible, without regard to privity, for the economic loss which results from his breach
of the Uniform Commercial Code's implied warranty of merchantability." Id. at 81
(emphasis added). 

 In addition, this Court has held direct privity is not necessary when there is vertical
privity in a suit for economic loss under an express warranty. In Crosbyton Seed Co. v.
Mechura Farms, we held that direct privity was not necessary where the seed company
knew it was selling to a middleman, knew that the ultimate buyer was getting some of the
seed, and the "bag tag" constituted an express warranty. 875 S.W.2d 353, 361 (Tex.
App.-Corpus Christi 1994, no writ). Earlier, in National Bugmobiles, Inc. v. Jobi Properties,
we concluded that no direct privity was required where an exterminator made a "perpetual,
freely transferable express written warranty" knowing that the exterminated house may be
sold, thus, extending the warranty to the buyers of the house. 773 S.W.2d 616, 622 (Tex.
App.-Corpus Christi 1989, writ denied); see U.S. Tire-Tech, Inc. v. Boeran, 110 S.W.3d
194, 198 (Tex. App.-Houston [1st Dist.] 2003, pet. denied) (op. on rehr'g) (holding in a
vertical-privity-DTPA-breach-of-express-warranty case, "that [direct] privity of contract is
not required in order to sustain a breach of express-warranty claim for purely economic
losses").

 The Texas Supreme Court has also extended responsibility for personal injuries
resulting from an implied breach of warranty under the UCC where there is horizontal
privity. In Garcia v. Texas Instruments, Inc., Garcia suffered severe acid burns when he
tripped at work while carrying containers of concentrated sulphuric acid. 610 S.W.2d at
457. Garcia's employer purchased the sulphuric acid from Texas Instruments. Id. Garcia
sued Texas Instruments alleging breach of the implied warranty of merchantability. Id. 
The supreme court concluded that, through Garcia's employer, there was a relationship
between the non-purchasing employee who was affected by the product and Texas
Instruments. See id. at 463-65. Applying the same factors it had utilized in rejecting privity
as a requirement in actions based on strict liability in tort, the Garcia Court reasoned that,

 [t]here is no adequate rationale or theoretical explanation why non-users and
non-consumers should be denied recovery against the manufacturer of a
defective product. The reason for extending the strict liability doctrine to
innocent bystanders is the desire to minimize risks of personal injury and/or
property damage. A manufacturer who places in commerce a product
rendered dangerous to life or limb by reason of some defect is strictly liable
in tort to one who sustains injury because of the defective condition. . . .


Id. at 465 (quoting Darryl v. Ford Motor Co., 440 S.W.2d 630, 633 (Tex. 1969)). In Garcia,
the supreme court held that "privity of contract is not a requirement for a uniform-commercial-code-implied-warranty action for personal injuries." Id. (emphasis added).

 Seitz, however, is not in vertical privity, and he is not suing for physical injury. 
Therefore, his warranty claims differ from the plaintiffs' claims in Nobility Homes and
Garcia. Moreover, Texas courts have not extended liability in a breach-of-warranty case
where a party in horizontal privity sues a seller for only economic damages. See Hou-Tex,
26 S.W.3d at 109; see also Keith v. Stoelting, Inc., 915 F.2d 996, 999 (5th Cir. 1990) (per
curiam) (interpreting Texas law and holding, in a case where a state employee sued the
polygraph manufacturer after he failed a polygraph test and lost his job, that "Texas will not
extend horizontal privity to economic loss cases. . . ."). But see Kaiser Aluminum & Chem.
Sales, Inc. v. PPG Indus,, Inc., No. IP 91-367-C, 1992 WL 695317, at *3 (S.D. Ind. 1992),
aff'd, 42 F.3d 1147 (7th Cir. 1994) (concluding, in light of Nobility's holding that privity is not
a requirement for the UCC implied warranty action for economic loss, "because there is no
privity requirement for implied warranty of merchantability actions under Texas law, PPG
is not entitled to judgment on Kaiser's merchantability warranty claim"). We are guided by
the reasoning in Hou-Tex. 26 S.W.3d at 108-09.

 Specific to the facts of this case, it is undisputed that Seitz, in his individual capacity,
owns the patents for the technology in question and that he has a licensing agreement with
Microtherm whereby he is to be paid 4% of every sale as a royalty. Seitz asserts that
Dana's breach resulted in his economic loss, as the patent owner and licensor, because
(1) his patents lost value precluding him from licensing them on a global basis, and (2) he
lost royalties as a consequence of a reduction in the sale of the Seisco water heater. 
However, Seitz never bought, used, or possessed Dana's thermistors. Instead, Microtherm
purchased the thermistors from Dana. Further, Microtherm licensed Seitz's patents and
profited from the patent technology. The related profit or loss, if any, filtered through
Microtherm, not Dana. Seitz attempts to leap-frog over Microtherm to impose liability on
Dana, with whom Seitz had no patent relationship whatsoever. Seitz, in his individual
capacity, is solely affected by Dana's product through his licensing arrangement with
Microtherm, the direct purchaser or user of the defective product. We cannot conclude
that Seitz is among those in horizontal privity who can sue for economic loss caused by
Dana's breach of express or implied warranty.

 As expressed by the Houston court in Hou-Tex, while we must exercise caution in
making further extensions of the requirement of privity between the plaintiff and the product
seller in breach of express or implied warranty claims, "[w]e must also be cautious in
creating a rule that disallows claims not at issue in this case." 26 S.W.3d at 109. 
Therefore, today we do not hold "that all parties in horizontal privity with the seller are
disallowed from suing for economic loss caused by breach of [express or] implied
warranty." Id. Rather, considering all the evidence presented at trial and viewing it in
Seitz's favor as much "as the record allows," under the specific facts of this case, we
conclude that Seitz cannot maintain an action against Dana for breach of express or
implied warranty. The trial court's directed verdict on Seitz's warranty claim can be
supported on this basis. See S.V., 933 S.W.2d at 8.

C. DTPA Claim

 Seitz also contends through his cross-issue that he is qualified as a consumer and,
therefore, his DTPA claim against Dana should be reinstated. In order to invoke the DTPA,
one must be a "consumer," defined as "an individual . . . who seeks or acquires by
purchase or lease, any goods or services." Tex. Bus. & Com. Code Ann. § 17.45(4)
(Vernon Supp. 2008). In determining whether a plaintiff is a consumer, the focus is on the
plaintiff's relationship to the transaction, not on the plaintiff's contractual privity, if any, with
the opposing party. Amstadt v. U.S. Brass Corp., 919 S.W.2d 644, 650 (Tex. 1996)
(determining that the court must examine whether a manufacturer's conduct occurred in
connection with the plaintiffs' purchases of their homes). A third-party beneficiary may
qualify as a consumer as long as the transaction was specifically required by or intended
to benefit the third party and the good or service was rendered to benefit the third party.
Arthur Andersen, 945 S.W.2d at 815 (holding "consumer" includes intended beneficiary
of goods or services); Kennedy v. Sale, 689 S.W.2d 890, 892 (Tex. 1985) (concluding that
the employees were the primary intended beneficiaries of an insurance policy purchased
by their employer and, therefore, were consumers); Birchfield v. Texarkana Mem'l Hosp.
d/b/a Wadley, 747 S.W.2d 361, 364, 368 (Tex. 1987) (holding that a premature infant
acquired goods and services sold by a hospital, regardless of the fact that she did not
contract for them). However, incidental beneficiaries of goods or services do not qualify
as DTPA consumers. See Vinson & Elkins v. Moran, 946 S.W.2d 381, 407-08 (Tex.
App.-Houston [14th Dist.] 1997, writ dism'd by agr.) (concluding that will beneficiaries
injured by the estate counsel's legal malpractice were incidental beneficiaries and not
DTPA consumers); Banzhaf v. ADT Sec. Sys. Sw., Inc., 28 S.W.3d 180, 187 (Tex.
App.-Eastland 2000, no pet.) (holding that an employee was not a DTPA consumer of an
alarm system purchased by the employer for the protection of the employer's premises at
night); Brandon v. Am. Sterilizer Co., 880 S.W.2d 488, 492 (Tex. App.-Austin 1994, no
writ) (holding that a hospital employee injured by a defectively repaired gas sterilizer was
only an incidental beneficiary and, therefore, not a consumer). Although the DTPA is to
be interpreted liberally, see Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 541 (Tex.
1981), we are not persuaded that the Texas Legislature intended the DTPA to apply to
causes of action by patent owners and licensors against manufacturers who provide parts
to the licensee company for the technology in question. Cf. Moran, 946 S.W.2d at 407
(stating that the court was not persuaded that the Texas Legislature intended the DTPA
to apply to causes of action by will beneficiaries against the attorneys hired by the
executors of the estate).

 The relevant issue in determining whether a party is a consumer for purposes of
bringing a DTPA claim is the purpose behind the purchases of the goods or services. Id.
at 408 (citing Brandon, 880 S.W.2d at 492); see also Arthur Andersen, 945 S.W.2d at 815. 
While an employee is entitled to consumer status when the goods or services are
purchased for the primary purpose of benefitting the employee, when the goods or services
are purchased for the primary purpose of benefitting the business, and any use or benefit
of those products extends to the employee only incidentally, the employee does not have
standing to sue under the DTPA. Moran, 946 S.W.2d at 408 (citing Brandon, 880 S.W.2d 
at 492).

 Similarly, in this case, it was the company, not Seitz in his individual capacity as the
owner and licensor of the patents, that purchased the component parts from Dana. 
Microtherm's purpose in purchasing the thermistors was to build tankless water heaters. 
Any benefit of these purchases would obviously extend to Seitz as the patent holder who
would receive royalties and, arguably, an increased value to the patents if the performance
of the Seisco was successful. See id. Any benefit derived by Seitz as the patent owner
and licensor, however, was merely incidental to the main purpose, i.e., manufacturing a
tankless water heater. See id. We cannot conclude that Microtherm purchased
thermistors from Dana for the principal purpose of providing a benefit to Seitz. In this and
other instances, the fortunes of third parties are affected by the sale of a product. See id. 
The mere fact that these third parties are benefitted by the performance of a component
part in the manufactured product or incidentally damaged by the sales performance of the
manufactured product because of a failed component part does not provide the third-parties consumers with rights to an action under the DTPA. See id. Third parties with
ownership in patents relevant to this technology are "incidental beneficiaries," and we do
not believe the legislature intended to confer consumer status on them. Thus, we conclude
Seitz, individually, was not a consumer and was not entitled to bring an action under the
DTPA. The trial court's directed verdict on Seitz's DTPA claim was appropriate on this
basis.

D. Negligence Claim

 Finally, Seitz contends that he has a valid claim against Dana for injury to his
patents based on their loss in value allegedly caused by Dana's negligence in providing
defective thermistors to Microtherm. "Texas courts have applied the economic loss rule
to preclude tort claims between parties who are not in contractual privity." City of Alton v.
Sharyland Water Supply Corp., 277 S.W.3d 132, 152 (Tex. App.-Corpus Christi 2009, pet.
filed) (op. on rehr'g) (quoting Sterling Chems., Inc. v. Texaco Inc., 259 S.W.3d 793, 797
(Tex. App.-Houston [1st Dist.] 2007, pet. denied)). "'Economic loss' has been defined as
'damages for inadequate value, costs of repair and replacement of the defective product,
or consequent loss of profits--without any claim of personal injury or damage to other
property. . . .'" Id. (quoting Thomson v. Espey Huston & Assocs., 899 S.W.2d 415, 421
(Tex. App.-Austin 1995, no writ)). In tort cases where there is an absence of privity of
contract, economic damages are not recoverable unless they are accompanied by actual
physical injury or property damage. See City of Alton, 277 S.W.3d at 152-53 (citing
Express One Int'l, Inc. v. Steinbeck, 53 S.W.3d 895, 899 (Tex. App.-Dallas 2001, no pet.);
Coastal Conduit & Ditching, Inc. v. Noram Energy Corp., 29 S.W.3d 282, 288-89 (Tex.
App.-Houston [14th Dist.] 2000, no pet.); Hou-Tex, 26 S.W.3d at 107).

 In this case, Seitz and Dana were not in contractual privity. Seitz seeks
compensation only for economic damages--the loss in value of his patents. Because
Seitz has not identified any physical injury or property damage that he has sustained as
a result of defective products provided by Dana, we conclude that the economic loss rule
bars Seitz's negligence claim against Dana. The trial court's rationale for granting the
directed verdict on Seitz's negligence claim can be supported on this basis. See Kelly, 832
S.W.2d at 90.

 Accordingly, we overrule Seitz's sole cross-issue.

IX. Conclusion

 We affirm the portion of the trial court's judgment regarding liability; modify the
judgment to reflect a damage award against Dana in the amount of $200,000 in actual
damages and $250,000 in additional damages and affirm that portion of the judgment as
modified; and reverse the portion of the judgment awarding attorneys' fees against Dana
and remand the case for retrial of that issue. In addition, Microtherm elected to recover
under the DTPA claims based on damages recovered. On remand, Microtherm should be
given the opportunity to reconsider its election in light of our analysis. See Gunn Infiniti,
18 S.W.3d at 718.

 We also affirm the trial court's directed verdict entered in favor of Dana and against
Seitz, individually.

 

 NELDA V. RODRIGUEZ

 Justice


Memorandum Opinion delivered and

filed this 31st day of August, 2009.
1. Throughout the record, thermistors are also referred to as "temperature senders" and "temperature
sensors." For ease of reference, we will refer to these component parts as thermistors.
2. Mavid Maquilardora, S.A., was originally named as a plaintiff but ultimately non-suited its claims after
the plaintiffs rested their case.
3. Microtherm and Seitz sued other component parts manufacturers, including Puget Plastics
Corporation (Puget), United Plastics Group (UPG), and Emerson Electric Co. (Emerson). Puget and UPG
made plastic chambers for Microtherm's water heater during the relevant time period. Emerson manufactured
the heating element used in the water heater.


 Before trial, the court rendered summary judgment in favor of these defendants and against Seitz on
his individual claims. Seitz does not appeal that judgment. Emerson settled with Microtherm before the trial
began, and the jury found in favor of Microtherm and against Puget and UPG. Although Puget and UPG filed
notices of appeal, they requested, and this Court granted, dismissal of their notices because they had settled
post-judgment. Therefore, Puget, UPG, and Emerson are not parties to this appeal.
4. Seitz testified that Microtherm replaced "over almost [sic] 500" thermistors in 2001.
5. In addition, the jury found that Puget breached warranties and violated the deceptive trade practices
act (DTPA) and Microtherm sustained damages as follows: (1) $175,000 for the cost to repair and/or replace
the failed plastic chambers; (b) $7,340,000 in lost profits; and (c) $15,000,000 for the loss in value. As against
UPG, the jury found the same violations and breaches and awarded Microtherm the following damages: (a)
$100,000 for the cost to repair and/or replace the failed plastic chambers; (b) $5,850,000 in lost profits; and
(c) $11,500,000 for lost value. The total amounts awarded on the breach of warranty and DTPA claims as
against Dana, Puget, and UPG, were repair and/or replacement costs for the failed parts in the amount of
$475,000, lost profits in the amount of $25,590,000, lost business value in the amount of $41,500,000, and
attorneys' fees in the amount of $30,348,628.
6. Concluding the conduct was committed knowingly, the jury also awarded Microtherm $400,000 as
against Puget and $600,000 as against UPG.
7. The jury awarded actual and exemplary fraud damages totaling $4,330,000 against Puget and
$3,180,000 against UPG on Microtherm's fraud claim.
8. In addition to pre-judgment and post-judgment interest, the trial court also ordered that Microtherm
recover attorneys' fees from Puget in the amount of $10,309,088 and from UPG in the amount of $7,576,055. 
9. It is undisputed that the contract or series of contracts in this case were, in fact, numerous invoices
reflecting thermistors Dana sold to Microtherm.
10. Although Trillo did not use scientific testing to rule out a possible seal breach as a cause of the
failures, Trillo testified that she did not consider the seals as a source of failure because she did not observe
any seal breaches or any contaminants on the seals.
11. After Trillo spoke to Seitz, she deleted this conclusion from her report. Dana contends that Trillo
removed the conclusion because Seitz asked her to do so and argues that her abandonment of her own
opinion at the direction of the client bears the indicia of untrustworthiness. This, however, is a factor for the
jury to consider in determining the credibility of the expert's testimony. See E.I. du Pont de Nemours & Co.
v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995) ("[T]he jury will continue to assess the weight and credibility
of the [expert's] proffered testimony.").
12. Trillo testified that the control thermistor had been placed in service in 1997.
13. Trillo testified that the history was important because it "indicated that the rate of failure increased
after a certain period of time, so there must have been something that occurred in 1999 and forward that
would cause the failures to occur, an increased number of failures to occur."
14. Trillo explained that the results showed that those springs that came from the failed sensors had
a large amount of red deposits or rust on the ends of the spring. The control did not have any iron oxide or
rust.
15. Dana also appears to suggest that Trillo, who agreed that she was not qualified to perform a
statistical analysis, attempted to do so in an effort to support her extrapolation. This argument, however, is
without merit because, even if we were to agree that Trillo provided such testimony, the trial court, at defense
counsel's request, instructed the jury to disregard that testimony. Dana does not complain on appeal that the
jury disregarded the trial court's instruction.
16. The DTPA provides for the award of additional damages for statutory violations that are committed
"knowingly." See Tex. Bus. & Com. Code § 17.50(b)(1) (Vernon Supp. 2008). Having found Dana knowingly
failed to comply with its express warranty, the jury awarded $250,000 additional damages to Microtherm and
against Dana.
17. Relying on Crawford v. Ace Sign, Dana also contends that the gravamen of Microtherm's complaints
is breach of contract or breach of warranty, not DTPA laundry list violations or unconscionable acts. 917
S.W.2d 12, 12-13 (Tex. 1996) (per curiam). Having determined the jury's finding on breach of express
warranty under the DTPA supports liability, we need not reach this contention. See Tex. R. App. P. 47.1.
18. The term "indivisible injury" means an injury which from its nature cannot be apportioned with
reasonable certainty to the individual wrongdoers. Amstadt v. U. S. Brass Corp., 919 S.W.2d 644, 654 (Tex.
1996) (citing Landers v. E. Tex. Salt Water Disposal Co., 248 S.W.2d 731, 734 (Tex. 1952)). If a plaintiff's
injuries are indivisible, defendants are jointly and severally liable for the whole amount if they fail to meet their
burden to prove any apportionment of liability for the plaintiff's injuries. Id.; Landers, 248 S.W.2d at 734.
19. During pre-trial proceedings, the trial court granted summary judgment ordering "that [Microtherm]
shall not be entitled to pursue a theory of joint and several liability among the defendants; rather [Microtherm]
shall be required to prove causation and damages separately . . . ."
20. At the charge conference, Microtherm again asserted its position that the damages were indivisible,
requesting a question on indivisible damages. The trial court refused this question and submitted divisible
damage questions.
21. Microtherm also asserts, by way of a cross-issue, that the trial court erred in refusing its requested
instruction on Microtherm's lost business opportunities with DuPont, including the lost opportunity relating to
the DuPont stock purchase agreement. However, the same reasoning applies to this cross-issue. By moving
for an unqualified judgment, Microtherm has not preserved its right to complain of the trial court's refusal to
include a lost business opportunities instruction in the charge. See Casu v. Marathon Ref. Co., 896 S.W.2d
S.W.3d 388, 390 (Tex. App.-Houston [1st Dist.] 1995, writ denied) (citing First Nat. Bank of Beeville v. Fojtik,
775 S.W.2d 632, 633 (Tex. 1989) (per curiam)). We overrule Microtherm's cross-issue regarding charge
error.
22. Dana challenges only the sufficiency of the evidence to support the damages awarded against it for
lost profits and lost value. Dana does not challenge the money awarded against it for the cost of repairing
and/or replacing the failed thermistors or the amount awarded against it because the jury found Dana's
conduct was committed knowingly. Therefore, we address this evidentiary argument only as it relates to the
jury's damage findings for lost profits and lost value. See Tex. R. App. P. 47.1.
23. Microtherm provided testimony regarding indivisible damage amounts for lost profits and loss in
value. However, we find no testimony or other evidence regarding separate or divisible damage amounts that
was admitted into evidence. We note that, through an offer of proof on the day the case was to be argued
to the jury, Seitz did testify that he could show which particular customers Microtherm lost because of each
component part. He informed the trial court of the exact percentage of lost customers due to Dana (47%),
Puget (33%), and UPG (21%). Seitz prepared an exhibit detailing the breakdown of lost customers by failures
of each defendant. Counsel for Microtherm informed the trial court that it did not have to call Seitz to testify
but could, instead, offer this exhibit summarizing his testimony. The trial court accepted the offer of proof but
sustained the defendants' objections to the testimony and exhibit. Microtherm does not challenge this ruling
on appeal.
24. The trial court also awarded trial attorneys' fees in the amount of $10,309,058 against UPG and
$7,576,055 against UPG. No appellate fees were awarded.
25. Dana also challenges the sufficiency of the evidence to support the trial court's attorneys' fee award
because the fees were not segregated by cause of action or by party. "[T]he party seeking recovery of
attorney's fees always has the burden of proof to show that the fees were incurred against the particular
defendant sought to be charged." Au Pharm., Inc. v. Boston, 986 S.W.2d 331, 336 (Tex. App.-Texarkana
1999, no pet.); see Stewart Title Guaranty Co. v. Sterling, 822 S.W.2d 1, 10-11 (Tex. 1991) ("Where a plaintiff
seeks to charge multiple defendants and one or more of those defendants have settled, the plaintiff must
segregate the fees so that the remaining defendants are not charged fees for which they are not
responsible."). Further,


 if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a
claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not
make tort fees recoverable; it is only when discrete legal services advance both a
recoverable and unrecoverable claim that they are so intertwined that they need not be
segregated.


Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 314 (Tex. 2006). Because we are remanding the portion
of the judgment awarding attorneys' fees against Dana for retrial, we need not address this issue at this time
as it is not dispositive. See Tex. R. App. P. 47.1.